UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

DR. SHARDUL KOPPAR,

               Plaintiff,

    - against -

ORANGE REGIONAL MEDICAL CENTER,
GREATER HUDSON VALLEY HEALTH SYSTEM, INC.
a/k/a GARNET HEALTH, DR. AAMIR GILANI,
DR. SAMER EL ZARIF, and DR. SAJID MIR,

               Defendants.

------------------------------------------------------------------X

Index No.: 19-CV-11288

**COMPLAINT**

**JURY TRIAL
DEMANDED**

Plaintiff,  SHARDUL KOPPAR by and through his attorneys Law Offices of Seth L. Marcus

alleges as and for his complaint against the defendants as follows:

**<u>NATURE OF ACTION</u>**

1. Plaintiff, Dr. Shardul Koppar ("Koppar") alleges breach of contract and illegal

   employment discrimination against the Orange Regional Medical Center ("ORMC") and

   Greater Hudson Valley Health System for personal injuries, economic damages including

   attorney's fees. These injuries were the result of intentional reckless conduct of ORMC,

   its agents, servants and/or employees in violation of Koppar's  contractual rights and

   Federal Constitutional Rights and N.Y. State Human Rights Law, N.Y. State Executive

   Law and rights pursuant to Title VII of the Civil Rights Act of 1964 as amended, which

   took place, *inter alia,* through the systematic harassment of Koppar by the below

   namedsupervisory staff,  two instances of unjustified non-promotion, and the ultimate

   wrongful termination of his PYG 2 residency contract.  Koppar further alleges causes of

   action against certain individuals for tortious interference with his employment contract.

## JURISDICTION AND VENUE

2.  This Court has jurisdiction of the claims herein pursuant to 28 U.S.C. §1331 and 1343, as well as U.S.C. § 12117 to incorporate by reference Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §2000(e)-5, 29 U.S.C. §1001 et seq.  This court also has supplemental jurisdiction of all State causes of action, pursuant to 28 U.S.C. §1367.

3.  This Court further has jurisdiction of the claims herein pursuant to 28 U.S.C. §1332 as the controversy is between citizens of different States and the amount in controversy exceeds $75,000.

4.  Venue is properly placed in the Southern District of New York pursuant to 28 U.S.C. §1391(b)(1) in that defendants have a principle place of business in this District and also the events which gave rise to this action occurred within this District.

5.  This action is timely commenced within ninety days of Plaintiff's receipt of his right to sue letter dated September 25, 2019 from the U.S. Equal Employment Opportunity Commission.

## PARTIES

6.  Dr. Shardul Koppar ("Koppar" or "Plaintiff"), is an individual domiciled in the State of New Jersey, residing at 37 Edgemere Drive, Kendall Park, New Jersey 08824.

7.  Koppar's race and nationality is Asian-Indian American.  His religion is Hindu.

8.  Upon information and belief, defendant Orange Regional Medical Center ("ORMC"), is a 501(c) (3), domestic non-profit organization formed pursuant to the laws of the State of New York.  It was formed by the merger of Arden Hill Hospital and Horton Medical

Center. In 2011, Orange Regional moved the two campuses into a single-site located at 707 East Main Street, Middletown, New York.

9.   Upon information and belief, ORMC employed in excess of  five hundred employees and is now and was at all times mentioned herein an employer within the meaning of Title VI of the 1964 Civil Rights Act  42 U.S.C §§b2000d- 2000d-7;  Title VII of the Civil Rights Act of 1964, as amended, 42.U.S.C. §2000(e) et seq. ;42 U.S.C. §1981; The Age Discrimination  in Employment Act of 29 U.S.C. §623 §626 ("ADEA") and the  New York State Human Rights Law, Executive Law Section 291, 296  et seq.

10. Upon information and belief, GREATER HUDSON VALLEY HEALTH SYSTEM, INC. ("GHVHS") is a New York State, not-for-profit corporation headquartered in Middletown, New York. GHVHS is comprised of ORMC, Catskill Regional Medical Center, Catskill Regional and Orange Medical Groups, and Catskill Regional and Orange Regional Medical Center Foundations.

11. Upon information and belief, GHVHS has 3,500 employed professionals and over 850 medical staff members and was at all times mentioned herein an employer within the meaning of Title VI of the 1964 Civil Rights Act  42 U.S.C §§b2000d- 2000d-7;  Title VII of the Civil Rights Act of 1964, as amended, 42.U.S.C. §2000(e) et seq. ;42 U.S.C. §1981; The Age Discrimination  in Employment Act of 29 U.S.C. §623 §626 ("ADEA") and the  New York State Human Rights Law, Executive Law Section 291, 296  et seq.

12. Upon information and belief Dr. Aamir Gilani ("Gilani") is an individual domiciled in the State of New York.  He is employed by ORMC and maintains a place of business at 707 East Main Street, Middletown, New York.

13. Upon information and belief Dr. Gilani's race is Asian, his national origin is Pakistani, and his religion is Muslim. Dr. Gilani attended Medical School in Pakistan at Army Medical College, Quaid-e-Azam University located in Rawalpindi, Pakistan.

14. Upon information and belief Dr. Samer El Zarif ("El Zarif") is an individual domiciled in the State of New York.  He is employed by ORMC and maintains a place of business at 707 East Main Street, Middletown, New York.

15. Upon information and belief Dr. El Zarif's race is Arab, his national origin is Lebanese, and his religion is Muslim. El Zarif attended University of Balamand Faculty of Medicine, in Lebanon.

16. Upon information and belief, Dr. Sajid Mir ("Mir") is an individual domiciled in the State of New York.  He is employed by ORMC and maintains a place of business at 707 East Main Street, Middletown, New York.  Mir attended Nishtar Medical School located in Punjab, Pakistan.

17. Mir is and was at all relevant times the Program Director of Internal Medicine Residency for ORMC's Graduate Medical Education Program.

18. Upon information and belief. Mir's race is Asian, his national origin is Pakistani, and his religion is Muslim.

## OPERATIVE ALLEGATIONS AND FACTS

**A.**     ***Residency and Licensing of Physicians Generally.***

19. There are two professional bodies that manage and control medical education and professional certification of all physicians in the United States.  The first is the American Osteopathic Association ("AOA"); the second is the American Medical Association ("AMA").

20. Both the AOA and the AMA have approved degree programs throughout the United States, leading to either a DO degree (AOA) or an MD degree (AMA). Following a prospective physician's graduation from medical school, both the AMA and AOA require organized and structured clinical training experience known as Residency.

21.  To complete their Residency, a trainee-doctor (known as a Resident) typically must complete three in-training graduated examinations spread over three years. For Koppar the required exam is known as Comlex 1, 2, and 3, which examinations are conducted under the auspices of the AOA.

22. The clinical Residency programs are typically provided by designated hospitals. These hospitals go through an accreditation process and continuous monitoring of their training content and delivery through regular reports to the AMA and/or AOA . Essentially, accredited hospitals, staffed with experienced doctors undertake to provide the needed hands-on training to Resident doctors in return for recognition  as well as compensation.

23. The compensation is significant. Hospitals receive about $150,000 per year, per resident from Centers for Medicare and Medicaid Services ("CMS"). Residency is a contractual business between the hospital and CMS. ORMC has about 115 residents each year for which, upon information and belief, it is collecting roughly $16,500,000 annual gross revenue from CMS.

24. In the present case, ORMC is accredited by the AOA and Koppar's internal medicine residency, if completed, would have led to the authority to practice licensed medicine in a clinic or hospital within that specialty. The status obtained is called "attending physician."

25. Failure to complete one's residency has dire consequences.  The result of such failure is that the physician is not employable nationwide and is not recognized b companies and organizations including CMS, insurance companies, and healthcare facilities.

26. The process of obtaining a residency is mediated and regulated by the AOA and AMA. Graduating medical students seeking internships are required to go through a computerized matching program.  The AOA program through which Koppar obtained his residency at ORMC is called the National Residency Matching Program ("NRMP").

27. The "match" as it is known, is a large annual process that opens in July and is not completed until the following March.  It encompasses more that 43,000 applicants and 31,000 residency positions.  Applicants are assigned a specific residency position after a computer algorithm is applied to "match" the applicant's prioritized choices with hospitals' lists of prioritized acceptances.  Once assigned, the applicant is required to sign a contract with the program to which they are assigned.

28. Graduating medical students are prohibited from seeking a residency without going through either the AMA or AOA matching programs and accredited hospitals are prohibited from offering contracts outside of the respective matching programs.

29. All jurisdictions within the United States issue doctor/physician licenses based upon and only upon attainment of certification issued by the AMA or AOA either directly or through certain sub-bodies.  Accordingly, a doctor's failure to complete a certified Residency program will effectively bar him/her from ever practicing their chosen profession even after completing a rigorous and expensive medical school program.

**B.      *Koppar's Employment/Residency with ORMC.***

30. Following his graduation from medical school, Koppar began his employment with ORMC in June of 2016 as a resident in the Transitional Rotation Internship ("TRI") program. This is a one-year residency wherein the resident completes rotations in various departments (emergency department, internal medicine floors, ICU, surgery, pediatrics, etc.).

31. The purpose of a TRI program is to provide a one-year training program where residents are allowed to chose their rotation curriculum.  The objective of a TRI resident is to strengthen his/her medical skills with the hope of entering a full residency program in their chosen medical field.

32. There were eight residents in ORMC's TRI class of June 2016-2017.  Koppar was the only resident of Indian ancestry and the only Hindu resident.

33. Two TRI residents, initials JC and GF, were white males applying to enter the General Surgery residency.  Both were accepted to ORMC's General Surgery residency program.

34. Two other TRI residents, initials WB and HA were males, one white and one Pakistani, were interested in Emergency Medicine.  WB (white male) was accepted to an Emergency Medicine residency in the Midwest.  HA (Pakistani male) was accepted into ORMC's Emergency Medicine residency.

35. Koppar and the three other TRI residents were interested in Internal Medicine.  Of these three TRI residents, two, initials YL and CW were African-American females.  The remaining TRI resident, initials ST, was a Hispanic male.

36. On or about the fall of 2016 the four TRI residents interested in Internal Medicine were informed by Mir, the Internal Medicine residency Program Director, that five second year

positions ("PGY-2") were being added.  If accepted the TRI residents would have the advantage of having their TRI year count as a first year residency ("PGY-1") and thereby be able to complete residency a year sooner.

37. All four TRI residents applied by verbally expressing their candidacy to Mir (there was no written application).  Of the four TRI candidates, Koppar was the only one not accepted and given a PGY-2 contract.

38. The remaining two positions were filled by non-indian, non-hindu physicians from other hospitals.

39. Koppar was latter offered and accepted a PGY-1 contract for the Internal Medicine residency Program to run from June 2017-2018.

40. Koppar first came into contact with Galani in August/September of 2016 when he did his first rotation in the Intensive Care Unit ("ICU").  Gulani was among the supervising attending physicians.

41. On or about the week of  September 5, 2016 during that ICU rotation Gilani, who is a Muslim Pakistani asked Koppar about Koppar's racial background.  Gilani expressed surprise when Koppar told him that he was Indian.

42. There is a known historical hostility between Indians and Pakistanis.

43. There is a known historical hostility between Muslims and Hindus.

44. Following this discussion Gilani's attitude toward Koppar became demeaning and hostile.

45. An example of this hostile attitude was an incident also in September of 2016 during which Gilani, Koppar and several other residents were having a conversation in a coffee shop, discussing among other things work.  During this conversation Gilani twice singled

out Koppar saying "you will suffer."  There were no incidents during the ICU rotation to

warrant this verbal threat against Koppar.

46. Significantly, this occurred on or about the time period Koppar, along with three other

TRI residents, was applying for a PGY-2 contract in the Internal Medicine program.

47. At this time Gilani was also a member of the Clinical Competency Committee ("CCC")

which is responsible, among other things, for advancement in the ORMC residency

program and/or tendering residents contracts.

48. On or about November of 2016 Koppar was one of four TRI residents who applied for a

PGY-2 contract.  He was the only Indian or Hindu candidate and the only candidate

whose application was rejected.  Instead Koppar was tendered a conciliation PGY-1

contract requiring him to repeat his intern year.

49. Koppar was never given a reason why he was not offered a PGY-2 contract in Internal

Medicine, whereas the other three TRI residents who applied were so offered.

50. Thereafter, abuse by Gilani and another Muslim attending, El Zarif, became a theme of

Koppar's ICU rotations.

51. On or about March of 2017 Koppar had his second ICU rotation where he was again at

times supervised by Gilani as attending physician. During this rotation Koppar noticed

that  Gilani treated him differently from other residents. Koppar was subjected to frequent

demeaning tirades and screamed insults in front of other staff members by Gilani.  Gilani

also repeatedly questioned Koppar's desire to practice medicine.

52.  Other non-Indian residents under similar circumstance where not subjected to such

behavior by Gilani.

53. In March of 2018 Koppar did his third rotation in ICU. He was again subjected to insulting and demeaning behavior by Dr. Gilani, at times for mistakes by non-Indian/Hindu employees.  This included at least one instance where Gilani directed a hysterical tirade, in which he screamed multiple insults at Koppar because a non-Indian medical student, on her own initiative, improperly removed a patient's central vein catheter.  Gilani specifically threatened to pin blame for the incident on Koppar.

54. Upon information and belief, following or during this ICU rotation Gilani reported Koppar as "missing" from the rotation.

55. Any report of Koppar missing from his third ICU rotations was false.

56. At the conclusion of this rotation El Zarif, another ICU attending physician, submitted a negative evaluation in which for all categories Dr. Koppar was rated as having "critical deficiency" or "borderline."

57. Upon information and belief, El Zarif also falsely reported Koppar as missing from the ICU during his shift.

58. Significantly El Zarif was out sick and at no time did he act as attending physician during this rotation.

59. Upon information and belief, El Zarif and Gilani are close friends.

60. A second evaluation was submitted by a Dr. Murali Krishna (Indian/Hindu), who did act as attending physician during this rotation, which rated Dr. Koppar as mostly "Competent".

61. El Zarif's/Gilani's discriminatory vendetta against Koppar was further pushed in the CCC when, upon information and belief, in a meeting of March 13, 2018 El Zarif told the CCC that "he refused to document on poor deficiencies due to personal fear of safety and

resident having possible mental health issues."   Notwithstanding, this slander, the minutes of that meeting reflect "[t]his has not been seen by a majority of committee members."

62. Upon information and belief, based at least partially on unfair, inaccurate and discriminatory reviews and accusations by Gilani and El Zarif, On April 6, 2018  Koppar received a letter informing him that he has been placed on probation. The letter informed Koppar that failure to remediate the stated reasons for his probation would result in a non-tender of a  PGY-2 contract and termination of his participation in the ORMC residency program.

63. On May 14, 2018, Koppar wrote to Mir and Dr. Ryan Punsalen (the associate program director) requesting that El Zarif's baseless evaluation of Koppar's last ICU rotation be removed from his academic file.

64. In his request Koppar pointed out "[t]he document [evaluation] exists in my file without fulfilling any of the requirements expected of an academic evaluation. Fundamentally, there wasn't any actual evaluating that took place or could have taken place. Dr. El Zarif was never part of my ICU rotation, was never in the ICU with the residents, and never oversaw any clinical work that he could have reviewed or provided me feedback on."

65. The El Zarif evaluation was not removed from Koppar's file.  Koppar never received a response to his letter, nor was he given any explanation as to why the evaluation was retained in his file.

66. The probation delayed for three months Koppar's being offered a PGY-2 contract.

67. Eight residents from Koppar's PGY-1 class received timely PGY-2 contracts.  Of these eight Koppar had had superior scores to four of them based on in-training exams.

11

Nonetheless it was only Koppar that was put on probation with the delay in commencing

is PGY-2 year.

68.   Dr. Koppar did remediate, successfully completed his probation and was able to

continue his residency.  In the minutes of a meeting of August 29, 2019, Dr. Mir, the

Program Director note "Resident has shown increased [sic] improved [sic] of all areas of

concern noted in the remediation plan to satisfy requirements."

69. Koppar was extended a PGY-2 contract effective October 1, 2018. A copy of that

contract is attached hereto as Exhibit A.

**C. Koppar's PGY-2 Rotations and Termination**

70. The first rotation to which Koppar was assigned upon beginning his PGY-2 year was

called Ward D.  The Ward D rotation is among the most difficult rotation in the IM

residency at ORMC. This rotation requires the resident to manage a hospitalist

physician's entire list of patients alone instead of a team of residents seeing the list of

patients.

71. Ward D requires working long hours and pushes a resident to rapidly improve their

workflow efficiency. If a resident falters during this rotation, he or she may have to stay

until midnight to complete tasks and still have to return at 6am to start work.

72. Koppar received two very positive reviews from the two hospitalist attending physicians

of his performance in this rotation.  One was a written text message following the rotation

in which the attending physician wrote "you are always one of the best residents."

73. The second was an official evaluation where the attending physician reported "Resident

has shown tremendous improvement.  Takes criticism positively.  Works well on his

own. Keep up the good work!"

74. Following his Ward D rotation, starting in mid-October, Koppar was rotated through ICU for a fourth time.  Koppar was assigned a further ICU rotation notwithstanding that On or about, July of 2018 Dr. Sergio Obligado ("Obigado"), the Chairman of the CCC, sent an email to the Internal Medicine residency Program Director Mir recommending that Koppar not do further ICU rotations to avoid being subjected to further harassment by Gilani and El Zarif.

75. Koppar also had discussions with Mir in which he informed Mir that he felt he was "being targeted by the ICU attendings."  He informed Mir of Gilani and El Zarif's abusive behavior and that the reports of Koppar's supposed unauthorized absence from the ICU were false.

76. Mir's only response was "I have to believe attending physicians."

77. Upon information and belief Dr. Mir disregarded Obigado's email, perfunctorily dismissed Koppar's complaints, and did not investigate problems between Gilani, El Zarif and Koppar.

78. The first week of the rotation was completed without incident when Dr. Krishna was the attending.

79. In the second week of the rotation Gilani was again the attending physician. It was during this week that certain false charges that resulted in the termination of Dr. Koppar's PGY-2 contract occurred.

80. An anonymous report was made to ORMC's compliance hotline on November 2, 2018 at 6:39 am accusing Koppar of supposedly threating Gilani with physical violence in a conversation that was supposed to have occurred three days earlier (on October 30, 2018).

81. Koppar never made any such threats.

82. Upon information and belief, Gilani made an anonymous report to the OMRC compliance hotline on November 2, 2018 regarding Koppar's alleged threat.

83. Upon information and belief, El Zarif made an anonymous report to the OMRC compliance hotline on November 2, 2018 regarding Koppar's alleged threat.

84. On or about November 2, 2108 Dr. Koppar received a call informing him he is not permitted on hospital grounds but was given no explanation as to why.

85. Approximately one week after receiving the call of November 2, 2018, Koppar received another call, this time from a person in ORMC's human resources department asking him if he threatened an attending physician with physical harm or sent a nurse sexually explicit pictures.

86. Koppar answered no to both questions.  Without being given any documents regarding the allegations against him, Koppar was told he had one day to submit a written statement.  Koppar did submit such a statement denying any impropriety.

87. Thereafter, Koppar received a letter dated November 15, 2018 notifying him of the termination of his PGY-2 year contract.  Professional incompetence was not among the grounds provided by that letter for Koppar's termination.

88. Koppar submitted a statement appealing his termination dated January 17, 2019 in accordance with the ORMC GME Due Process Policy and Procedure attached to the termination letter.

89. An Appeal hearing was held regarding Koppar's termination on May 13, 2019 before an Ad Hoc Subcommittee of the Graduate Medical Education Committee (the "Ad hoc Subcommittee").

90. Koppar was not permitted to be represented by counsel at this hearing.

91. Koppar was denied a request for a reasonable adjournment in order to prepare for the hearing.

92. Koppar was not provided advance copies of the exhibits to be presented to the Ad hoc Subcommittee.

93. Koppar was not given any advance notice that witnesses would be asked to testify at this hearing, nor is there anything in the applicable Policy/Procedure stating that witness testimony will be taken.  Koppar was not permitted to examine the witnesses at the hearing.

94. The only academic evaluation presented to the Ad hoc Subcommittee for its consideration was the El Zarif evaluation made without any first-hand knowledge of Koppar's work during the rotation.

95. The Ad hoc Subcommittee was neither informed that Koppar had requested the evaluation be removed, nor was it provided with the positive academic evaluation submitted by Dr. Krishna, who did in fact supervise Koppar's clinical performance during that exact rotation.

96. The Ad hoc Subcommittee issued a report on July 30, 2019 that was forwarded to Koppar's council on August 15, 2019, in which it upheld the termination of Koppar's employment in the ORMC Internal Medicine Program.

97. The findings in the Ad hoc Subcommittee's report had several significant deviations from the evidence presented at the hearing.

98. Most notably the report's statement that "Dr. Koppar made physical threats of violence on more than one occasion toward a specific attending physician" was unsupported by

evidence at the hearing.  There was testimony given regarding a single instance that Koppar vigorously denied.

99. The report of the Ad hoc Subcommittee also wrongfully relied heavily upon supposed misconduct that occurred prior to the commencement date of Koppar's PGY-2 contract.

100.     By letter dated August 26, 2019 Koppar was informed through counsel that the full Graduate Medical Education Committee had met and agreed to uphold Koppar's termination in accordance with the Ad hoc Subcommittee's report and that this decision was approved by ORMC's CEO on August 8, 2019.

**As and For a First Cause of Action**
**Breach of Contract – Wrongful Termination**
**(Against ORMC and GHVHS)**

101.     Plaintiff repeats and restates all allegations contained in the prior paragraphs of this Complaint as if fully set-forth herein.

102.     ORMC and Koppar entered into a Graduate Medical Education Program Trainee Agreement – Year Two (the "Agreement") effective October 1, 2018, for a term commencing on that date and ending on September 30, 2019.

103.     Paragraph VII. A of the Agreement provides that the Agreement may only be terminated early by ORMC only upon sufficient enumerated causes.

104.     ORMC did breach the Agreement by terminating it without cause as required by Paragraph VII. A.

105.     Specifically, between October 1, 2018 (date of commencement) and November 1, 2018 (last date Koppar was permitted to perform services under the contract) there was no conduct by Koppar justifying termination of the Agreement for Cause.

106.     Between October 1, 2018 up through termination of the Agreement Koppar

performed all duties as required by the Agreement.

107.     Between October 1, 2018 up through termination of the Agreement, there were no

serious infractions of ORMC policy sufficient to justify termination of the Agreement.

108.     That as a result of ORMC's wrongful termination, Koppar has been seriously

damaged in his ability to gain future earnings from employment as a physician.

109.     Koppar has suffered damages as a result of this breach, which damages will be

proved at trial, including but not limited to all future earnings to which Koppar would

have received as a practicing physician.

### As and For a Second Cause of Action
### Breach of Contract – Wrongful Termination
### (Against ORMC and GHVHS)

110.     Plaintiff repeats and restates all allegations contained in the prior paragraphs of

this Complaint as if fully set-forth herein.

111.     Paragraph VII. C. provides that "[t]he Hospital will establish a grievance

procedure whereby the Trainee may resolve, in a fair and equitable manner, a dispute or

disagreement with the Program Director, Associate Director or Hospital concerning the

interpretation, application or enforcement of this Agreement, or the Hospital's established

policies, rules, regulations, directories or bylaws." [underline added].

112.     ORMC breached its duty to provide Koppar with a "fair and equitable" grievance

procedure by, *inter alia*:

   a.   Failing to provide him a complete statement of the allegations against him and

        thereby permit him to refute them;

b.  Ignoring its own guidelines on how to investigate allegations of sexual misconduct;

c.  Ignoring its own Due Process Policy and Procedure by failing to conduct a meeting between Koppar and the Program Director (Mir) to discuss any reports of rule violations;

d.  Denying Koppar access to his academic file in a timely manner for use in preparation of his appeal letter;

e.   Failing to give the Ad hoc Subcommittee a balanced accurate record of Koppar's conduct in the ORMC residency program;

f.  Imposition of a "gag order" preventing ORMC employees or medical staff members from communicating with Koppar thereby preventing him from developing materials, testimony, and/or letters of support in presenting his appeal;

g.  Failure to provide advance notice to Koppar that witnesses would appear before the Ad hoc Subcommittee (a deviation from the published Due Process Policy and Procedure) or the identity of those witnesses in advance of the hearing;

h.  Denying Koppar legal counsel at the appeal hearing – a failure in due process compounded once the Ad hoc Subcommittee determined that it would hear witness testimony;

i.  Denying Koppar  a reasonable adjournment in order to prepare for the hearing;

j.  Including additional incidents of alleged deficiencies at the hearing without giving prior notice to Koppar that he would be questioned about them at the hearing.

k.  Denying Koppar the right to questions those witnesses at the appeal hearing.

113.     Between October 1, 2018 up through termination of the Agreement Koppar performed all duties as required by the Agreement.

114.     Between October 1, 2018 up through termination of the Agreement, there were no serious infractions of ORMC policy sufficient to justify termination of the Agreement.

115.     That as a result of ORMC's wrongful termination, Koppar has been seriously damaged in his ability to gain future earnings from employment as a physician.

116.     Koppar has suffered damages as a result of this breach, which damages will be proved at trial, including but not limited to all future earnings to which Koppar would have received as a practicing physician.


**As and For a Third Cause of Action**
**Breach of Contract**
**( Against ORMC and GHVHS)**

117.     Plaintiff repeats and restates all allegations contained in the prior paragraphs of this Complaint as if fully set-forth herein.

118.     ORMC and Koppar entered into a Graduate Medical Education Program Trainee Agreement – Year Two (the "Agreement") effective October 1, 2018.

119.     Paragraph V.A. of that contract requires ORMC to "provide a suitable environment for Program training consistent with the standards promulgated from time to time by the AOA in the "Basic Document on Postdoctoral Training" or as stated in the specialty affiliate "Basic Standards" or as stated in Program policies.

120.     ORMC breached its duty to provide Koppar with a "suitable environment for Program training", by *inter alia*:

    a.   Subjecting Koppar to abusive, unprofessional behavior from faculty members;

    b.   Subjecting Koppar to discriminatory behavior from faculty members;

    c.   Failing to respond, investigate and/or remediate complaints of abusive and unprofessional behavior by faculty members;

    d.   Failing to protect the integrity of Koppar's academic file and properly investigate and remediate the inclusion of fraudulent reviews in that file;

    e.   Failing to observe stated hospital procedures in conducting investigations of alleged misconduct by Koppar;

    f.   Failing to observe stated hospital procedures in disciplining and ultimately terminating Koppar's contract.

121.     ORMC's breaches of its duty to provide Koppar with a "suitable environment for Program training" ultimately resulted in wrongful termination of the Agreement.

122.     Between October 1, 2018 up through termination of the Agreement Koppar performed all duties as required by the Agreement.

123.     Between October 1, 2018 up through termination of the Agreement, there were no serious infractions of ORMC policy sufficient to justify termination of the Agreement.

124.     That as a result of ORMC's wrongful termination, Koppar has been seriously damaged in his ability to gain future earnings from employment as a physician.

125.     Koppar has suffered damages as a result of this breach, which damages will be proved at trial, including but not limited to all future earnings to which Koppar would have received as a practicing physician.

**As and For a Fourth Cause of Action**
**Breach of Contract – Duty of Good Faith and Fair Dealing**
**(Against ORMC and GHVHS)**

126.    Plaintiff repeats and restates all allegations contained in the prior paragraphs of

this Complaint as if fully set-forth herein.

127.    Implied into every contract is a duty of good faith and fair dealing whereby, *inter*

*alia,* a contracting party is deemed to be prohibited from unreasonably taking action that

has the effect of denying another contracting party the expected benefit of the bargain.

128.    By its conduct as described above, including but not limited to its wrongful

termination of Koppar, ORMC did breach its duty of good faith and fair dealing owed to

Koppar by reason of both parties entering into the Agreement.

129.    That as a result of ORMC's wrongful termination, Koppar has been seriously

damaged in his ability to gain future earnings from employment as a physician.

130.    Koppar has suffered damages as a result of this breach, which damages will be

proved at trial, including but not limited to all future earnings to which Koppar would

have received as a practicing physician.

**As and For A Fifth Cause of Action**
**Title VII – Religious Discrimination**
**(Against All Defendants)**

131.    Plaintiff repeats and restates all allegations contained in the prior paragraphs of

this Complaint as if fully set-forth herein.

132.    The Defendants violated Title VII of the Civil Rights Act of 1964 by

discriminating against Koppar on the basis of his religion inasmuch as Defendants

engaged in a course of conduct, as stated above, which collectively resulted in Koppar's

harassment and termination by reason of his religion.

133.     Defendants Gilani, El Zarif, and Mir aided and abetted the discrimination and subsequent harm that resulted to Koppar as a result of said discrimination.

134.     By reason of his Hindu religion Koppar was treated less favorably than other similarly situated non-Hindu Residents regarding the terms of their employment, including but not limited to promotion within the Residency program, what conduct was disciplined and the consequences of such discipline.

135.     By reason of his Hindu religion Koppar was subject to direct harassment and verbal abuse by Muslim members of the ORMC Graduate Medical Program faculty.

136.     By reason of Koppar's Hindu religion such direct harassment and verbal abuse by members of the ORMC Graduate Medical Program faculty was permitted to continue.

137.     Further indicative of the pro-Muslim bias within ORMC's Graduate Medical Program is that upon information and belief, 8 of the 10 interns presently working in ORMC's program are Muslim, two are from Pakistani medical schools and none, upon information and belief are Hindu or Indian.

138.     Defendants' conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Koppar entitling him to punitive damages.

139.     By reason of Defendants discrimination, Koppar is entitled to all legal and equitable remedies available for violations of Title VII, including reinstatement of his employment with all discriminatory disciplinary actions expunged, compensatory damages and an award of punitive damages.

140.     Attorney's fees should be awarded under 42 U.S.C. §2000e-5(k).

**As and For a Sixth Cause of Action**
**NYSHRL – Religions Discrimination**
**(Against All Defendants)**

141.    Plaintiff repeats and restates all allegations contained in the prior paragraphs of this Complaint as if fully set-forth herein.

142.    The Defendants violated the New York State Human Rights Law, Executive Law §296 by discriminating against Koppar on the basis of his Hindu religion inasmuch as Defendants engaged in a course of conduct, as stated above, which collectively resulted in Koppar's harassment and termination by reason of his religion.

143.    Defendants Gilani, El Zarif, and Mir aided and abetted the discrimination and subsequent harm that resulted to Koppar as a result of said discrimination.

144.    By reason of his Hindu religion Koppar was treated less favorably than other similarly situated non-Hindu Residents regarding the terms of their employment, including but not limited to promotion within the Residency program, what conduct was disciplined and the consequences of such discipline.

145.    By reason of his Hindu religion Koppar was subject to direct harassment and verbal abuse by Muslim members of the ORMC Graduate Medical Program faculty.

146.    By reason of Koppar's Hindu religion such direct harassment and verbal abuse by members of the ORMC Graduate Medical Program faculty was permitted to continue.

147.    Further indicative of the pro-Muslim bias within ORMC's Graduate Medical Program is that, upon information and belief,  8 of the 10 interns presently working in ORMC's program are Muslim, two are from Pakistani medical schools and none, upon information and belief are Hindu or Indian.

148.    Defendants' conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Koppar entitling him to punitive damages.

149.     By reason of Defendants discrimination, Koppar is entitled to all legal and

equitable remedies available for violations of Executive Law §296 including

reinstatement of his employment with all discriminatory disciplinary actions expunged

compensatory damages and an award of punitive damages.

**As and For a Seventh Cause of Action**
**Title VII – National Origin Discrimination**
**(Against all Defendants)**

150.     Plaintiff repeats and restates all allegations contained in the prior paragraphs of

this Complaint as if fully set-forth herein.

151.     The Defendants violated Title VII of the Civil Rights Act of 1964 by

discriminating against Koppar on the basis of his national origin inasmuch as Defendants

engaged in a course of conduct, as stated above, which collectively resulted in Koppar's

harassment and termination by reason of his national origin.

152.     Defendants Gilani, El Zarif, and Mir aided and abetted the discrimination and

subsequent harm that resulted to Koppar as a result of said discrimination.

153.     By reason of his Indian national origin Koppar was treated less favorably than

other similarly situated non-Indian Residents regarding the terms of their employment,

including but not limited to promotion within the residency program, what conduct was

disciplined and the consequences of such discipline.

154.     By reason of his Indian national origin Koppar was subject to direct harassment

and verbal abuse by Muslim and/or Pakistani and Arab members of the ORMC Graduate

Medical Program faculty.

155.     By reason of Koppar's Indian national origin such direct harassment and verbal

abuse by members of the ORMC Graduate Medical Program faculty was permitted to

continue.

156.     Further indicative of the pro-Muslim bias within ORMC's Graduate Medical

Program is that, upon information and belief, 8 of the 10 interns presently working in

ORMC's program are Muslim, two are from Pakistani medical schools and none, upon

information and belief are Hindu or Indian.

157.     Defendants' conduct was intentional, deliberate, willful, malicious, reckless, and

conducted in callous disregard of the rights of Koppar entitling him to punitive damages.

158.     By reason of Defendants discrimination, Koppar is entitled to all legal and

equitable remedies available for violations of Title VII, including reinstatement of his

employment with all discriminatory disciplinary actions expunged, compensatory

damages and an award of punitive damages.

159.     Attorney's fees should be awarded under 42 U.S.C. §2000e-5(k).

### As and For an Eighth Cause of Action
### NYSHRL – National Origin Discrimination
### (Against all Defendants)

160.     Plaintiff repeats and restates all allegations contained in the prior paragraphs of

this Complaint as if fully set-forth herein.

161.     The Defendants violated the New York State Human Rights Law, Executive Law

§296 by discriminating against Koppar on the basis of his Indian national origin

inasmuch as Defendants engaged in a course of conduct, as stated above, which

collectively resulted in Koppar's harassment and termination by reason of his national

origin.

162.     Defendants Gilani, El Zarif, and Mir aided and abetted the discrimination and subsequent harm that resulted to Koppar as a result of said discrimination..

163.     By reason of his Indian national origin Koppar was treated less favorably than other similarly situated non-Indian Residents regarding the terms of their employment, including but not limited to promotion within the Residency program, what conduct was disciplined and the consequences of such discipline.

164.     By reason of his Indian national origin Koppar was subject to direct harassment and verbal abuse by Muslim and/or Pakistani members of the ORMC Graduate Medical Program faculty.

165.     By reason of Koppar's Indian national origin such direct harassment and verbal abuse by members of the ORMC Graduate Medical Program faculty was permitted to continue.

166.     Further indicative of the pro-Muslim bias within ORMC's Graduate Medical Program is that, upon information and belief, 8 of the 10 interns presently working in ORMC's program are Muslim, two are from Pakistani medical schools and none, upon information and belief are Hindu or Indian.

167.     Defendants' conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Koppar entitling him to punitive damages.

168.     By reason of Defendants discrimination, Koppar is entitled to all legal and equitable remedies available for violations of Executive Law §296 including reinstatement of his employment with all discriminatory disciplinary actions expunged compensatory damages and an award of punitive damages.

**As and For a Ninth Cause of Action**
**Tortious Interference With Employment Contract**

**(Individual Defendants)**

169.     Plaintiff repeats and restates all allegations contained in the prior paragraphs of this Complaint as if fully set-forth herein.

170.     At all relevant times, prior to its wrongful termination, Koppar and ORMC were parties to valid employment contracts.

171.     Gilani, El Zarif and Mir (hereinafter the "Individual Defendants) at all relevant times were aware that Koppar had entered into an employment contract with ORMC.

172.     That the Individual Defendants did intentionally interfere with Koppar's employment but entering into a malicious campaign to get Koppar's contract terminated by dishonest, unfair and improper means.

173.     That this campaign included submitting false and fraudulent academic evaluations, making false accusations of physical threats of violence, generally behaving in a demeaning and abusive manner toward Koppar, failing to take appropriate action upon being make aware of such demeaning and abusive behavior, and failing to follow employer disciplinary and due process guidelines.

174.     That these actions were not motived by legitimate concerns regarding Koppar's performance or fitness to pursue and career as a physician.

175.     That these actions were motivated by religious bias and/or bias against Koppar's national origin.

176.     That the malicious, dishonest, unfair and improper actions by the Individual defendants resulted in the termination of Koppar's employment contract.

177.     Koppar has suffered damages as a result of this breach, which damages will be proved at trial, including but not limited to all future earnings to which Koppar would have received as a practicing physician.

**Demand for Jury Trial**

178.     Plaintiff hereby demands a trial by jury in this action

**WHEREFORE:** Plaintiff, Dr. Shardul Koppar prays for judgment against Defendants:

A.   Reinstating his employment with ORMC and expunging from his employment/academic file all discriminatory, derogatory, and/or inaccurate letters, evaluations and records of adverse actions;

B.   Awarding him lost wages, fringe benefits and other benefits of employment in an amount to be calculated;

C.   Awarding him compensatory damages for future pecuniary losses, for emotional distress, for pain and suffering, and other non-pecuniary losses in a sum of not less than Twenty-five million ($25,000,000.00) dollars.

D.   Awarding him litigation costs, expenses and reasonable attorneys fees and disbursements;

E.   Awarding him such other and further relief as may be just and proper.

Dated: Scarsdale, New York
         December 10, 2019               Respectfully submitted,


                                         Seth L. Marcus, Esq. (SM3293)
                                         Law Offices of Seth L. Marcus, Esq.
                                         670 White Plains Road, Penthouse
                                         Scarsdale, New York 10583
                                         (t) 212-686-2555
                                         seth@slmarcuslaw.com