UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DR. SHARDUL KOPPAR,

                              Plaintiff,

            v.

ORANGE REGIONAL MEDICAL
CENTER, *et al.*,

                              Defendants.

---

No. 19-CV-11288 (KMK)

OPINION & ORDER

Seth L. Marcus, Esq.
Brian McCaffrey, Esq.
Law Offices of Seth L. Marcus
Scarsdale, NY
*Counsel for Plaintiff*

Joseph A. Saccomano, Jr., Esq.
Arin M. Liebman, Esq.
Jackson Lewis P.C.
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Dr. Shardul Koppar ("Plaintiff") brings this Action against Orange Regional Medical

Center ("ORMC"), Greater Hudson Valley Health System, Inc., a/k/a/ Garnet Health

("GHVHS"), Dr. Aamir Gilani ("Gilani"), Dr. Samer El Zarif ("El Zarif"), and Dr. Sajid Mir

("Mir"; together, "Defendants") for claims pursuant to Title VII and the New York State Human

Rights Law ("NYSHRL"), in addition to breach of contract, based on his termination from

ORMC's internal medicine residency program.  Before the Court is Defendants' Motion for

Summary Judgment, (the "Motion").  (*See* Not. of Mot. (Dkt. No. 48).)  For the foregoing

reasons, Defendants' Motion is granted.

I.  Background

A.  Factual Background

The following facts are taken from the Parties' statements pursuant to Local Rule 56.1,

(*see* Defs.' Rule 56.1 Statement ("Defs.' 56.1") (Dkt. No. 51); Pl.'s Rule 56.1 Statement ("Pl.'s

56.1") (Dkt. No. 56)), and the admissible evidence submitted by the Parties.  The facts are

recounted "in the light most favorable to" Plaintiff, the non-movant.  *Torcivia v. Suffolk County*,

17 F.4th 342, 355 (2d Cir. 2021).  The facts as described below are in dispute only to the extent

indicated.[1]

1.  ORMC's Residency Program

ORMC is a non-profit hospital located in Middletown, NY, which is wholly owned by

GHVHS.  (Defs.' 56.1 ¶ 1; Pl.'s 56.1 ¶ 1.)[2]  ORMC has a Graduate Medical Education ("GME")

_____

[1] Where the Parties "identify disputed facts but with semantic objections only or by asserting irrelevant facts, . . . which do not actually challenge the factual substance described in the relevant paragraphs, the Court will not consider them as creating disputes of fact."  *New Jersey v. N.Y.C. Dep't of Educ.*, No. 18-CV-6173, 2021 WL 965323, at *2 n.1 (S.D.N.Y. Mar. 15, 2021) (quoting *Gjini v. United States*, No. 16-CV-3707, 2019 WL 498350, at *1 n.4 (S.D.N.Y. Feb. 8, 2019)); *see also Nimkoff v. Drabinsky*, No. 17-CV-4458, 2021 WL 4480627, at *1 n.2 (E.D.N.Y. Sept. 30, 2021) ("[T]o the extent a party's Rule 56.1 statement improperly interjects arguments and/or immaterial facts in response to facts asserted by the opposing party without specifically controverting those facts [with admissible evidence], the [c]ourt has disregarded the statement." (quotation marks and alterations omitted)); *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("Many of [the] [p]laintiff's purported denials—and a number of [the plaintiff's] admissions—improperly interject arguments or immaterial facts in response to facts asserted by [the] [d]efendant[], often speaking past [the] [d]efendant['s] asserted facts without specifically controverting those same facts. . . .  [A] number of [the] [p]laintiff's purported denials quibble with [the] [d]efendant['s] phraseology, but do not address the factual substance asserted by [the] [d]efendant[].").

Where possible, the Court has relied on the undisputed facts in the Parties' 56.1 submissions.  However, direct citations to the record have also been used where relevant facts were not included in any of the Parties' Rule 56.1 submissions, or where the Parties did not accurately characterize the record.

[2] Several witnesses explained during their depositions that GHVHS changed its name to Garnet Health in 2020.  (*See, e.g.*, Aff. of Joseph A. Saccomano, Jr., Esq. in Supp. of Defs.'

Program comprised of six full-time residency programs.  (Defs.' 56.1 ¶ 3; Pl.'s 56.1 ¶ 3.)

Participants in the GME program, known as "residents," are recent graduates from medical

school who complete the program to gain additional training in clinical care in a chosen

specialty, such as internal medicine.  (*See* Saccomano Aff. Ex. 4 ("Pl. Dep."), at 30:17–22 (Dkt.

No. 50-6).)  ORMC began its Internal Medicine Residency ("IMR") Program in or around 2016,

and the IMR Program received accreditation in August 2018.  (Defs.' 56.1 ¶¶ 9, 10; Pl.'s 56.1

¶¶ 9, 10.)  The IMR Program is a three-year program; the three program years are referred to as

PGY-1, PGY-2, and PGY-3, respectively.  (Defs.' 56.1 ¶¶ 11–14; Pl.'s 56.1 ¶¶ 11–14.)  ORMC

also offers a Transitional Residency Internship ("TRI") Program, which is a one-year residency

program that recent graduates from medical school can participate in before entering a full-time

residency program.  (Defs.' 56.1 ¶ 5; Pl.'s 56.1 ¶ 5; *see also* Pl. Dep. 31:7–33:20.)  Participants

in the TRI Program complete rotations in various departments, including emergency medicine,

psychiatry, intensive care unit ("ICU") medicine, and internal medicine, to strengthen their skills

so that they can obtain a full-time residency.  (Defs.' 56.1 ¶¶ 6–7; Pl.'s 56.1 ¶¶ 6–7.)

Residents—including those in the TRI and IMR Programs—are considered both employees of

ORMC and students of the GME Program.  (Defs.' 56.1 ¶ 4; Pl.'s 56.1 ¶ 4.)

As employees of ORMC, residents are subject to the policies set out in ORMC's

employee manual.  Among other policies, the ORMC employee manual contains a Sexual

Harassment Policy, an Other Forms of Prohibited Harassment Policy, and a Non-Violence

---

Mem. for Summ. J. ("Saccomano Aff.") (Dkt. No. 50) Ex. 5 ("El Zarif Dep."), at 13:24–14:6
(Dkt. No. 50-7).)  ORMC's name was also changed, to the Garnet Health Medical Group.  (*See
id.* at 15:14–17.)  Because these entities were named GHVHS and ORMC during the pendency
of Plaintiff's employment, the Court will refer to them as such herein.

Policy.  (Defs.' 56.1 ¶¶ 34, 35, 40; Pl.'s 56.1 ¶¶ 34, 35, 40.)  ORMC's Sexual Harassment Policy

states, in relevant part:

> It is [ORMC's] policy to prohibit sexual harassment of our employees in any form.
> Sexually harassing conduct in the workplace, whether physical or verbal,
> committed by supervisors or non-supervisory personnel or any third party, is
> against the law and Hospital policy, and will not be tolerated. . . . [N]o supervisor,
> employee, or any third party, shall engage in any conduct, such as unwelcome
> sexual comments, jokes or innuendo, flirtations, advances or propositions, or
> physical or verbal sexual abuse, which creates a hostile work environment.  All
> employees are expected to conduct themselves in a professional manner at work
> and refrain from this conduct. . . . Any supervisor, agent[,] or other employee who
> is found after an investigation to have engaged in sexual harassment will be subject
> to appropriate disciplinary action, which may bypass any progressive disciplinary
> process and may include suspension and/or discharge.

(Saccomano Decl. Ex. 3 ("ORMC Employee Manual"), at 10–11 (Dkt. No. 50-5).)  ORMC's

Other Forms of Prohibited Harassment Policy states, in relevant part:

> It is [ORMC's] policy to prohibit harassment of one employee by another
> employee, supervisor[,] or any third party connected to [ORMC] on any
> basis . . . . While it is not easy to define precisely what harassment is, it certainly
> includes slurs, epithets, threats, derogatory comments[,] and unwelcome jokes or
> teasing. . . . Violations of this policy will not be permitted and will be subject to
> disciplinary action, which may bypass any progressive disciplinary process and
> may include suspension and/or discharge.

(*Id.* at 11.)  Finally, ORMC's Non-Violence Policy states, in relevant part:

> [ORMC] provides a safe workplace for all employees.  We do not tolerate any type
> of workplace violence committed by or against employees.  Employees are
> prohibited from making threats or engaging in violent activities[,]
> [including] . . . [m]aking threatening remarks (including 'I'll get even' or 'You'll
> get yours') . . . . Threats, threatening conduct, or any acts of aggression or violence
> in the workplace will not be tolerated.  Any employee determined to have
> committed such acts will be subject to appropriate disciplinary action, which may
> bypass any progressive disciplinary process and may include discharge.

(*Id.* at 11–12.)

Additionally, as students of the GME program, residents are subject to the policies set out

in the GME manual.  The GME manual contains a number of policies concerning promotion to

the subsequent level of residency, probation procedures if residents are found to not have

4

reached the level of competency required for promotion, and dismissal.  (*See* Saccomano Aff. Ex. 8 ("GME Manual") (Dkt. No. 50-11).)  For example, Policy No. 600011 provides, in relevant part, that "[e]ach Resident may be promoted to the next year of training if their performance indicates their ability to perform at the subsequent level . . . . Promotion to the next level of training and/or reappointment is made annually based on consideration of evaluation results and at the discretion of the Program Director and the Clinical Competency Committee (CCC)."  (*Id.* at ORMC_001163.)[3]  In order to make these decisions, "[t]he Program Director will obtain from the faculty, as well as from other pertinent sources and/or relevant communities, information on the performance of each Resident."  (*Id.*)  "Decisions resulting in probation, suspension, non-promotion, non-renewal, or dismissal are subject to Due Process procedures," which includes an appeal process.  (*Id.* at ORMC_001164.)

Specifically, Policy No. 600010, GME's Due Process Policy, provides that a resident "who has received an Appealable Sanction and wishes to appeal . . . must file an appeal within thirty (30) days of receiving the sanction," which "must be in writing and must specify the sanction being appealed, the sanction being appealed, the reasons for the appeal, [and] any new information the [resident] wishes to be considered."  (Saccomano Aff. Ex. 25, at ORMC_000619 (Dkt. No. 50-28).)  Upon receipt of an appeal, the Director of Osteopathic Medical Education ("DME") must appoint an ad hoc subcommittee to hear the appeal "comprised of the DME and

---

[3] The CCC is responsible for reviewing resident evaluations and making recommendations to the residency program director regarding whether a resident can progress to the next year of the program or requires remediation.  (Defs.' 56.1 ¶¶ 104, 106; Pl.'s 56.1 ¶¶ 104, 106.)  The CCC typically meets twice a year to review the performance of all residents in the IMR Program and to come up with a specific recommendation for each resident based on the resident's rotations, test scores, attendance, and overall performance.  (Defs.' 56.1 ¶¶ 108–09; Pl.'s 56.1 ¶¶ 108–09.)  The recommendation for an underperforming resident can include a performance improvement plan.  (Defs.' 56.1 ¶ 110; Pl.'s 56.1 ¶ 110.)  The CCC can also hold ad hoc meetings to address time sensitive situations.  (Defs.' 56.1 ¶ 111; Pl.'s 56.1 ¶ 111.)

two members of the [GME committee]," and "[a]t least two members of the subcommittee shall be from departments other than the [resident's] department." (*Id.*) The subcommittee must hold a hearing on the appeal within ten days, which "will consist of a presentation by the Program Director and a presentation by the [resident]" or another resident or member of the medical staff serving as the resident's representative. (*Id.*) The subcommittee must then either recommend upholding the sanction, imposing a sanction of lesser severity, or imposing no sanction, which the GME program committee votes to accept or reject; the Program Director whose decision is being appealed is not permitted to participate in this decision or vote. (*Id.* at ORMC_000620; *see also* Defs.' 56.1 ¶¶ 246–51; Pl.'s 56.1 ¶¶ 246–51.)

Finally, Policy No. 600040 establishes a remediation and progressive performance policy with a series of escalating steps the GME program may take "to correct academic and/or professional deficits, including, but not limited to, deficits in medical knowledge, time management, organizational abilities, communication skills, and procedural skills." (GME Manual, at ORMC_001238–39.) These steps include: verbal and/or written warning, remediation, probation, grievance, suspension, non-renewal, and termination. (*Id.* at ORMC_001239.)

### 2. Plaintiff's Residency at ORMC

Plaintiff is Hindu and of Indian national origin. (Defs.' 56.1 ¶¶ 25–27; Pl.'s 56.1 ¶¶ 25–27.) Plaintiff received a doctorate in osteopathic medicine—also known as a "D.O."—from Nova Southern University College of Osteopathic Medicine in May 2016 and entered ORMC's TRI Program in June. (Defs.' 56.1 ¶¶ 24, 28; Pl.'s 56.1 ¶¶ 24, 28.) Plaintiff received copies of both the ORMC employee manual and the GME manual when he was hired. (Defs.' 56.1 ¶¶ 30, 32; Pl.'s 56.1 ¶¶ 30, 32.)

6

a.  Plaintiff's TRI Year

In August 2016, Plaintiff began his first rotation in the ICU, which lasted approximately

four weeks.  (Defs.' 56.1 ¶¶ 41–42; Pl.'s 56.1 ¶¶ 41–42.)  During rotations, residents are

supervised by more senior physicians known as "attending physicians," or "attendings," who

have already completed their residencies in their chosen specialties.  (*See* Pl. Dep. 142:16–

143:22.)  During Plaintiff's August–September 2016 rotation in the ICU, he was supervised by a

group of three attending physicians: Gilani, El Zarif, and Dr. Murali Krishna ("Krishna").  (*Id.* at

163:9–22.)  Plaintiff's first interactions with both Gilani and El Zarif were during this rotation.

(Defs.' 56.1 ¶¶ 44, 63; Pl.'s 56.1 ¶¶ 44, 63.)

On September 5, 2016—during the second week of Plaintiff's ICU rotation—Plaintiff

and Gilani were walking back to the ICU together from a consult, and while they were walking

down a stairwell, Gilani asked Plaintiff where he was from and where his family was from.

(Defs.' 56.1 ¶¶ 45–47; Pl.'s 56.1 ¶¶ 45–47.)  Plaintiff responded, "I've lived in many places in

my lifetime, but my family and I are originally from India."  (Defs.' 56.1 ¶ 48; Pl.'s 56.1 ¶ 48.)

Gilani responded by expressing surprise, looking at Plaintiff and asking, "you are Indian?"

(Defs.' 56.1 ¶ 49; Pl.'s 56.1 ¶ 49.)  Plaintiff responded in the affirmative, Gilani said "okay," and

the two went back to work.  (Defs.' 56.1 ¶¶ 50–51; Pl.'s 56.1 ¶¶ 50–51.)  Plaintiff testified that it

was not uncommon for doctors to ask one another about their backgrounds in forming

relationships.  (Pl. Dep. 134:13–17 ("[W]hen we work with one another in a hospital setting, we

try – we do know one another as far as our backgrounds and maybe even ask[] . . . questions.").)

Gilani is Muslim and of Pakistani national origin.  (Defs.' 56.1 ¶¶ 22–23; Pl.'s 56.1 ¶¶ 22–23.)

Plaintiff claims that "prior to this conversation and learning of [Plaintiff's] Indian

ancestry . . . Gilani had been far more informal and friendly toward [Plaintiff]."  (Pl.'s 56.1 ¶ 51.)

Later in September 2016, Gilani, Plaintiff, and three other residents rotating through the ICU took a break at a coffee shop near the front entrance to the hospital.  (Defs.' 56.1 ¶¶ 53–54; Pl.'s 56.1 ¶¶ 53–54.)  Gilani—whose specialty in ICU medicine is pulmonary critical care, (Defs.' 56.1 ¶ 21; Pl.'s 56.1 ¶ 21)—began to give Plaintiff advice about reading books on pulmonology while working in the ICU, (Defs.' 56.1 ¶ 55; Pl.'s 56.1 ¶ 55).  Gilani then moved to a different topic, and Plaintiff started to research something Gilani had said on his cell phone. (Defs.' 56.1 ¶¶ 56–57; Pl.'s 56.1 ¶¶ 56–57.)  While Plaintiff was still on his cell phone, he heard Gilani say, "while here, you will suffer."  (Defs.' 56.1 ¶¶ 58–59; Pl.'s 56.1 ¶¶ 58–59.)  Plaintiff then looked up from his cell phone and made eye contact with Gilani, but did not respond; shortly after, the group left the coffee shop to return to work in the ICU.  (Defs.' 56.1 ¶¶ 59–62; Pl.'s 56.1 ¶¶ 59–62.)

El Zarif also supervised Plaintiff's work during Plaintiff's August–September 2016 rotation in the ICU.  (Defs.' 56.1 ¶ 64; Pl.'s ¶ 64.)  El Zarif claims that he observed a number of deficiencies in Plaintiff's performance during Plaintiff's first week.  (Defs.' 56.1 ¶¶ 65–68.) Specifically, El Zarif claims that Plaintiff was late for rounds daily (and continued to arrive late after receiving multiple warnings), did not complete patient notes in a timely fashion, and disappeared in the middle of the day without informing anyone.  (*Id.*)  Plaintiff disagrees with El Zarif's opinion that his performance was deficient.  (Pl.'s 56.1 ¶¶ 65–68.)  On September 6, 2016, El Zarif raised these concerns to the TRI Program Director, Dr. Christian Castro-Nunez ("Castro-Nunez"), in an email.  (Defs.' 56.1 ¶¶ 8, 69; Pl.'s 56.1 ¶¶ 8, 69.)  El Zarif wrote:

> I want to bring to your attention some problems we've been having with [Plaintiff]. So far he has worked with both me and [Gilani], and we both share multiple concerns about him. [1] He has been arriving late for rounds almost on a daily basis despite multiple warnings. [2] He is not preforming [sic] the tasks assigned to him (writing notes on his patients, seeing consults, talking to other physicians or family members, etc.[]) [3] He seems absent minded during rounds and lectures, and when

asked to repeat what was just said, he fails to do so. [4] He often disappears in the middle of the day without informing anyone. [5] An other [sic] concern is that he is not a team player and does not have a good rapport with the other residents.

(Saccomano Aff. Ex. 9 (Dkt. No. 50-12).)  Plaintiff met with Castro-Nunez and others to address these concerns several weeks later, agreed to work to improve, and did, in fact, improve, passing his August–September 2016 ICU rotation.  (Defs.' 56.1 ¶¶ 70–73; Pl.'s 56.1 ¶¶ 70–73.)

El Zarif is not religious (though he is a member of an unconventional religious organization called the "Church of the Flying Spaghetti Monster," whose members are known as "pastafarian," (El Zarif Dep. 154:14–22)), and is of Lebanese national origin, (Defs.' 56.1 ¶ 19; Pl.'s 56.1 ¶ 19).[4]  El Zarif never asked Plaintiff about his national origin or religion and never made any comments about Plaintiff's national origin or religion.  (Defs.' 56.1 ¶ 74; Pl.'s 56.1 ¶ 74.)

When ORMC began the IMR Program in 2016, the program had only five PGY-1 residents, all five of whom were promoted to PGY-2 at the end of the 2016–17 contract term. (Defs.' 56.1 ¶¶ 75–76; Pl.'s 56.1 ¶¶ 75–76.)  ORMC recruited ten PGY-1 residents for the 2017–18 contract term and added five new PGY-2 positions so that the two class years would be balanced in numbers.  (Defs.' 56.1 ¶¶ 77–78; Pl.'s 56.1 ¶¶ 77–78.)  In the Fall of 2016, Castro-Nunez told the TRI residents that the IMR Program was adding five new PGY-2 spots, which would be open to the TRI residents; TRI residents who were accepted into the PGY-2 positions would receive the benefit of having their TRI year "count" as their PGY-1 year for purposes of completing their residencies.  (Defs.' 56.1 ¶ 80; Pl.'s 56.1 ¶ 80; *see also* Pl. Dep. 150:8–152:16.)

---

[4] El Zarif did testify that "[i]n Lebanon, when you're born, they stamp you with a religion," and indicated that based on this cultural practice, he would have been considered Muslim based on his father's religious identity.  (El Zarif Dep. 155:1–4.)  However, he clarified that he "never practiced any religion" and "never identified" and did not identify "as being a Muslim."  (*Id.* at 155:2–4.)

Four of the eight TRI residents, including Plaintiff, expressed an interest in one of the PGY-2 positions.  (Defs.' 56.1 ¶ 81; Pl.'s 56.1 ¶ 81.)  At this time, Mir was the Program Director of the IMR Program, and was responsible for making the decisions as to who would be accepted into ORMC's IMR Program.  (Defs.' 56.1 ¶¶ 16, 90, 94; Pl.'s 56.1 ¶¶ 16, 90, 94.)  Mir did not offer Plaintiff a PGY-2 contract at this time; the positions were filled by the other three TRI residents who had expressed interest and by two external candidates.  (Defs.' 56.1 ¶¶ 95–96; Pl.'s 56.1 ¶¶ 95–96.)

Instead, Plaintiff participated in the National Resident Matching Program—a program run by a national organization that algorithmically places students into residency programs by "matching" student applicants with residency positions based on rank-ordered lists created by both the applicants and the programs.  (Defs.' 56.1 ¶¶ 84–88; Pl.'s 56.1 ¶¶ 84–88.)  Mir interviewed Plaintiff as part of the matching process, and Plaintiff ranked ORMC's IMR Program first on his match list.  (Defs.' 56.1 ¶¶ 89, 91; Pl.'s 56.1 ¶¶ 89, 91.)  Mir was responsible for creating the IMR Program's match list and ranked Plaintiff either last or close to last.  (Defs.' 56.1 ¶ 90; Pl's 56.1 ¶ 90; *see also* Saccomano Aff. Ex. 2 ("Mir Dep."), at 95:11–16 (Dkt. No. 50-3).)  Plaintiff "matched" with ORMC's IMR Program and was offered a PGY-1 contract by Mir, which Plaintiff accepted.  (Defs.' 56.1 ¶¶ 92, 97, 99; Pl.'s 56.1 ¶¶ 92, 97, 99.)

Mir is Muslim and of Pakistani national origin.  (Defs.' 56.1 ¶ 17; Pl.'s 56.1 ¶ 17; *see also* Mir Dep. 62:2–5.)  Mir never indicated that Plaintiff's religion or national origin was a factor in his decision not to select Plaintiff for a PGY-2 contract, and never acted in a hostile manner toward Plaintiff.  (Defs.' 56.1 ¶¶ 100–01; Pl.'s 56.1 ¶¶ 100–01.)

### b.  Plaintiff's PGY-1 Year and Probation

Plaintiff began his PGY-1 year in the IMR Program in July 2017.  (Defs.' 56.1 ¶ 102; Pl.'s 56.1 ¶ 102.)  The CCC—which, at the time, was comprised of El Zarif, Mir, Dr. Sergio

Obligado ("Obligado"), Dr. Ryan Punsalan ("Punsalan"), and Dr. Leroy Cordero ("Cordero")—

held a biannual meeting on November 25, 2017 to review resident performance.  (Defs.' 56.1

¶¶ 112–13; Pl.'s 56.1 ¶¶ 112–13.)  At the time, Obligado was the chairman of the CCC.  (Defs.'

56.1 ¶ 114; Pl.'s 56.1 ¶ 114.)  During the meeting, the CCC discussed various concerns about

Plaintiff's performance, which were memorialized in a letter written by Obligado, with input

from El Zarif and Punsalan.  (Defs.' 56.1 ¶¶ 115–16; Pl.'s 56.1 ¶¶ 115–16; *see also* Decl. of Seth

L. Marcus in Opp'n to Mot. for Summ. J. ("Marcus Decl.") (Dkt. No. 59) Ex. CC (Dkt. No. 59-

9).)  The letter was dated November 29, 2017 and addressed to Mir, who met with Plaintiff

several days later to provide Plaintiff with a copy.  (Defs' 56.1 ¶ 124; Pl.'s 56.1 ¶ 124; *see also*

Saccomano Aff. Ex. 10, at ORMC_000198 (Dkt. No. 50-13).)  The letter stated that "[t]he

[CCC] has serious concerns about the performance of [Plaintiff]," and detailed a series of

deficiencies in the professionalism, interpersonal communication skills, and patient care

milestones, with illustrative examples.  (Saccomano Aff. Ex. 10, at ORMC_000198–199.)  These

examples included the following:

- "[A] ward attending commented that [Plaintiff] had severe professionalism issues
  'including not responding to pages from nursing staff or texts from team members
  (senior resident and attending)' as well as 'napping in the afternoon during his work
  shift.'"

- "Multiple evaluations mentioned inappropriate use of his cell phone, such as taking
  personal calls while speaking with patients and/or family members."

- "Last year, while [Plaintiff] was rotating through the ICU during his TRI year, [El
  Zarif] was approached by a nursing supervisor who alleged, per her own
  observations, that [Plaintiff] has been 'stalking the younger nurses.' . . . This year,
  during his [emergency department] rotation, he had been observed asking nurses for
  their cell phone numbers for use outside of patient care."

- "One ward attending wrote that [Plaintiff] '[n]eed[s] to document truthful physical
  exam.'  In addition it was written that 'discharge summaries had rectal and genital
  exam which [Plaintiff] never performed.'"

11

- "An evaluator stated that [Plaintiff] 'needs constant oversight and will put patient[s] lives in danger if issues remain.'  This evaluator also stated that he has a 'tough time focusing on work.'"

- "One disturbing incident was described in which 'a patient was hypotensive and the nursing staff and team members (senior resident, attending) were unable to reach [Plaintiff] for approximately 1.5 hours."

(*Id.*)  The letter also set forth an improvement plan with detailed suggestions as to how Plaintiff's performance must improve and warned that "[t]he CCC feels that [Plaintiff] should not be graduated to a PGY-2 status unless he makes significant changes."  (*Id.* at ORMC_000199–200.) Finally, the letter informed Plaintiff that the CCC wished to assign Plaintiff a mentor to assist Plaintiff in repairing his deficiencies; Obligado offered to serve as Plaintiff's mentor.  (*Id.* at ORMC_000200–201.)[5]  Plaintiff accepted Obligado as his mentor, and the two had several in-person mentorship meetings.  (Defs.' 56.1 ¶ 125; Pl.'s 56.1 ¶ 125.)

On January 18, 2018, Mir added an addendum to the November 29, 2017 letter to memorialize a meeting Mir had with Plaintiff on the same day.  (Saccomano Aff. Ex. 10, at ORMC_000201.)  The addendum states:  "Met with [Plaintiff] again on 1/18/18.  Re: bad cardiology evaluation and inappropriate use [of cell phone].  [Plaintiff] understands that he is on a remediation plan.  He will meet frequently with . . . Obligado.  [Plaintiff] understands that if professionalism issues happen again or he gets poor evaluations, he will be placed on probation on [M]arch 1, 2018."  (*Id.*)  Dr. Emmanuel Nketiah was, at the time, an attending physician and the GME core faculty member for cardiology.  (*See* Mir Dep. 47:24–48:15.)  Both Mir and Plaintiff signed the addendum.  (Saccomano Aff. Ex. 10, at ORMC_000201.)

---

[5] The Court notes that the version of this letter which is cited and quoted in Defendants' 56.1 Statement does not appear to be the final version of the letter that was ultimately provided to Plaintiff.  (*See* Pl. Dep. 225:12–234:20.)  The Court cites to the final version of the letter.

The CCC held another biannual meeting on March 13, 2018 to put together a list of residents who would be promoted, which was attended by El Zarif, Mir, Obligado, Punsalan, and Tina Diaz ("Diaz"), the IMR Program coordinator.  (Defs.' 56.1 ¶¶ 127–29; Pl.'s 56.1 ¶¶ 127– 29.)  At the meeting, the CCC did not recommend Plaintiff for promotion to PGY-2, and instead, recommended that Plaintiff either be placed on probation or terminated.  (Saccomano Aff. Ex. 10, at ORMC_000205–06.)  The minutes from the CCC meeting explain that Plaintiff "has not successfully shown improvement since [being] placed with a mentor and advised regarding deficiency in [his] training during meeting in November 2017.  Several areas of poor performance and critical deficiencies [are] still apparent."  (*Id.* at ORMC_000205.)  The minutes go on to provide several examples, including: (1) "One attending stated he refused to document on poor deficiencies due to personal fear of safety and resident having possible mental health issues"; (2) "Multiple attendings have voiced concerns about this [PGY-1].  Initially showed improvement when addressed in November [2017] but returned to bad habits (disappearing, personal phone, responsibility, note taking)"; and (3) "Other residents on serve with him are fearful of being paired in a team as supported by review of Peer Evaluations."  (*Id.* at ORMC_000206; *see also* Defs.' 56.1 ¶¶ 130–34; Pl.'s 56.1 ¶¶ 130–34.)

The CCC held an ad hoc meeting four days later, on March 17, 2018, to review Plaintiff's remediation plan and possible promotion.  (Saccomano Aff. Ex. 10, at ORMC_000208.)  Mir, Obligado, Punsalan, and Diaz were in attendance, and the CCC approved Plaintiff's promotion to PGY-2, citing, inter alia, improvements Plaintiff had shown when working one-on-one with Mir. (*Id.*)  However, the CCC still expressed "concerns that once [Plaintiff's] promotion [is] made to PGY-2[,] [Plaintiff's] performance will revert to 'old habits' such as disappearing during rounds,

poor communication with team senior/attending, and non-participation or initiative in patient care." (*Id.*; *see also* Defs.' 56.1 ¶¶ 135–40; Pl.'s 56.1 ¶¶ 135–40.)

In April 2018, Mir gave Plaintiff a letter signed by both Mir and Obligado and dated April 6, 2018 that informed Plaintiff that his PGY-1 was being extended for three months and that Plaintiff was being placed on academic probation for six months, until September 30, 2018. (Defs.' 56.1 ¶¶ 142, 144–45; Pl.'s 56.1 ¶¶ 142, 144–45; *see also* Saccomano Aff. Ex. 10, at ORMC_000213–214.)  The letter listed the following "[r]easons for probation": (1) "[f]ailure to improve based on mentorship assignment and evaluation after critical deficiencies [were] found during November 2018 [sic] competency assessment"; (2) "[n]ot receptive to feedback and long term performance improvement"; (3) "[c]annot advance beyond the need for direct supervision in the delivery of patient care"; (4) "[n]ot completing basic physician responsibilities"; and (5) "[u]nable to handle same patient case load as [that which a TRI resident should be able to handle] in final months of [PGY-1] year." (Saccomano Aff. Ex. 10, at ORMC_000213.)  The letter warned Plaintiff that "probation is a serious adverse status in residency and fellowship training, and that if [his] performance [did] not improve . . . [his] position in the program may be terminated or [his] contract not renewed." (*Id.*)  Finally, the letter stated that Plaintiff's performance would be reassessed no later than July 31, 2018 and that he would be restored to good standing with satisfactory performance on this reassessment. (*Id.*)  Plaintiff was also provided with a performance improvement plan, which listed a number of deficiencies that had been identified in Plaintiff's performance and detailed an action plan designed to improve these deficiencies, which included "[m]onthly mentor meetings" with Obligado and "[s]cheduling [Plaintiff] on 1:1 resident-attending teams to review patient cases thoroughly." (*Id.* at ORMC_000215–16; *see also* Defs.' 56.1 ¶¶ 150–51; Pl.'s 56.1 ¶¶ 150–51.)

14

Plaintiff completed another ICU rotation in March 2018.  (Defs.' 56.1 ¶ 154; Pl.'s 56.1 ¶ 154.)  On April 28, 2018, El Zarif submitted an evaluation of Plaintiff's performance during this rotation, specifically in the period from March 5 to March 11, 2018.  (*Id.*)  While El Zarif did not directly work with Plaintiff during this period of time, he collected feedback from other ORMC staff members who did.  (Defs.' 56.1 ¶ 157; Pl.'s 56.1 ¶ 157.)  It was not atypical for El Zarif—who, at the time, was both an ICU attending and a member of the GME core faculty for internal medicine, (*see* El Zarif Dep. 14:23–15:20, 16:15–22)—to complete evaluations of residents based on feedback from others, (*see* Defs.' 56.1 ¶¶ 155–56).  The evaluation form includes a list of 32 competencies, each of which is accompanied by a rating scale with the options "Unable to Assess," "Critical Deficiency," "Borderline," "Competent," and "Exemplary."  (*See* Marcus Decl. Ex. T.)  El Zarif rated Plaintiff as having a "Critical Deficiency" in 18 competencies, as "Borderline" in 13 competencies, and as "Competent" in 1 competency.  (*Id.* at ORMC_000434–35.)  Krishna provided an evaluation of Plaintiff's performance during the same period of time, and rated Plaintiff as "Competent" in 28 competencies and "Borderline" in the remaining 4 competencies.  (*Id.* at ORMC_000436–37.)  On May 1, 2018, Plaintiff asked Mir to remove El Zarif's April 2018 ICU evaluation from Plaintiff's academic file; Mir submitted Plaintiff's request to GME program leadership, but the evaluation was not removed.  (Defs.' 56.1 ¶¶ 158–60; Pl.'s 56.1 ¶¶ 158–60.)

### c.  Plaintiff's PGY-2 Year and Termination

Mir approved Plaintiff's promotion to PGY-2 on August 29, 2018, and Plaintiff signed his PGY-2 contract on the same day; ORMC counter-signed on September 7, 2018.  (Defs.' 56.1 ¶ 161; Pl.'s 56.1 ¶ 161; *see also* Saccomano Aff. Ex. 14 ("PGY-2 Contract"), at 12 (Dkt. No. 50-17).)  The term of Plaintiff's PGY-2 contract was October 1, 2018 to September 1, 2019.  (Defs.' 56.1 ¶ 164; Pl.'s 56.1 ¶ 164.)  Among other provisions, Plaintiff's PGY-2 contract included a

number of "Trainee Obligations."  (PGY-2 Contract § VI.)  One such provision provided that

"[Plaintiff] shall comply with all policies applicable to Hospital exempt employees,

including . . . compliance with [ORMC's] Sexual Harassment Policy" and "shall honor and abide

by all other approved, published policies and procedures of [ORMC], as may be adopted from

time to time."  (*Id.* at § VI.G.; *see also* Defs.' 56.1 ¶ 166; Pl.'s 56.1 ¶ 166.)  Plaintiff's PGY-2

contract also provided that Plaintiff could only be terminated for cause, enumerating what

behaviors were sufficient to constitute cause: (1) "[p]rofessional incompetence of [Plaintiff]";

(2) "[s]ubstantial breach of the terms of the [PGY-2 contract] by [Plaintiff]"; (3) "[s]erious

neglect of duty of violation [sic] of [ORMC] rules, regulations[,] or policies by [Plaintiff]";

(4) "[c]onviction of a crime thought by the Program Director to render [Plaintiff] unfit

professionally to practice medicine"; (5) "[c]onduct by [Plaintiff] seriously and clearly

prejudicial to the best interest of [ORMC]"; (6) "[Plaintiff's] falsification of any information

supplied to [ORMC] by [Plaintiff] as part of the entrance requirements of the Program, or

knowingly giving false information or assisting others in doing so"; and (7) "[u]napproved

absence of [Plaintiff] from the Program."  (PGY-2 Contract §§ VII.A.1.–7.; *see also* Defs.' 56.1

¶ 167; Pl.'s 56.1 ¶ 167.)  The contract also provided that "[i]f the Program Director determines

that [Plaintiff] has materially failed to comply with any specific obligations or intent of this

[PGY-2 contract], he or she shall be authorized to terminate this [PGY-2 contract] or take such

disciplinary action, including fines, as may be appropriate."  (PGY-2 Contract § VII.A.8.)

Finally, Plaintiff's PGY-2 contract included an integration clause.  (PGY-2 Contract § VIII.F.;

Defs.' 56.1 ¶ 170; Pl.'s 56.1 ¶ 170.)

Mir was the Program Director and Punsalan was the Assistant Program Director during

Plaintiff's PGY-2 year.  (Defs.' 56.1 ¶ 171; Pl.'s 56.1 ¶ 171.)

<u>i.  The October 30, 2018 Incident</u>

On October 30, 2018, Plaintiff worked an overnight shift on the ICU floor with several other care providers, including Jennifer Selby ("Selby"), an acute care nurse practitioner, and Sienna LeCorps ("LeCorps"), a nurse.  (Defs.' 56.1 ¶¶ 172–73; Pl.'s 56.1 ¶¶ 172–73; *see also* Saccomano Aff. Ex. 15 ("Selby Dep."), at 31:13–21 (Dkt. No. 50-18).)  Plaintiff, Selby, and LeCorps did rounds together in the ICU on that evening, (Defs.' 56.1 ¶ 174; Pl.'s 56.1 ¶ 174), and Defendants claim that right before the group arrived to room 3106 to check on a patient, Plaintiff started speaking to LeCorps about his relationship with Gilani and how much Plaintiff did not like Gilani.  (Defs.' 56.1 ¶ 175; *see also* Selby Dep. 31:13–32:22.)  Defendants claim that during this conversation, Selby heard Plaintiff tell LeCorps that he "hated [Gilani] so much he wanted to bash his face in with a baseball bat."  (Defs.' 56.1 ¶¶ 176–77; *see also* Selby Dep. 34:12–23.)  Defendants claim that Selby observed that Plaintiff appeared to be very angry when he made this statement.  (Defs.' 56.1 ¶ 178.)  Plaintiff denies that any such conversation took place.  (Pl.'s 56.1 ¶¶ 175–78.)

Selby was concerned about what Plaintiff may do to Gilani, so the following morning, she pulled Gilani aside to tell him about Plaintiff's statement.  (Defs.' 56.1 ¶¶ 180–81.)  On November 2, 2018, at 6:29 am, the GME program received an anonymous report via ORMC's internal software platform which stated: "There is a resident by the last name Koppar currently in ICU that has been speaking and acting very inappropriately to the intensivist over the past days. I am part of the staff here and I have heard him speak about physically harming Dr. Gilani more than once.  Not sure if he is just an [sic] angry at him but we are honestly fearful this will escalate further.  Even if it was joking or said in anger this resident is not safe for staff or patients."  (Defs.' 56.1 ¶¶ 186–87; Pl.'s 56.1 ¶¶ 186–87; *see also* Saccomano Aff. Ex. 18 (Dkt. No. 50-21).)  Ten minutes later, at 6:39 am, ORMC received an anonymous complaint from an

ORMC employee via the hospital's Compliance Hotline Report, which stated: "There is a resident in the ICU Koppar Shardul [sic] that has been making physician [sic] threats of violence more than once towards Dr. Gilani.  He has threatened to punch him and hit him in the head. This has been heard by more than one staff member, including nurses, in our unit.  He seems very angry so we are quiet [sic] scared of what he may do towards the doctor."  (Defs.' 56.1 ¶¶ 183–85; Pl.'s 56.1 ¶¶ 183–85; *see also* Saccomano Aff. Ex. 18.)  Selby testified that she did not make these reports and did not tell anyone except Gilani about Plaintiff's statement.  (Selby Dep. 26:5–19, 43:3–6.)

Human Resources Administrator Kathleen Pagani ("Pagani") investigated these complaints, and as part of her investigation, she interviewed ORMC staff who were working in the ICU on October 30, 2018.  (Defs.' 56.1 ¶¶ 188–89; Pl.'s 56.1 ¶¶ 188–89.)  Pagani interviewed Selby on November 2, 2018, and Selby told Plaintiff that she heard Plaintiff make a threat to harm Gilani.  (Defs.' 56.1 ¶¶ 190–91; Pl.'s 56.1 ¶¶ 190–91.)  Pagani testified that she found Selby to be "100 percent credible."  (Defs.' 56.1 ¶ 192; *see also* Saccomano Aff. Ex. 19 ("Pagani Dep."), at 53:13–15 (Dkt. No. 50-22).)  Pagani did not interview LeCorps but asked LeCorps' supervisor to speak with her.  (Pagani Dep. 40:11–17.)  On November 6, 2018, LeCorps sent an email to her supervisor, later forwarded to Pagani, in which she stated:  "I witnessed [Plaintiff] speak about his position/experience in the hospital and why he was a second year resident and not a third year resident.  Names of other staff members were mentioned, however, I do not recall who they were or their positions in the hospital.  I do not recall [Plaintiff] speaking in a threatening manner or wishing violence/harm on any staff members of the hospital."  (Marcus Decl. Ex. X, at 3 (Dkt. No. 59-24).)

<u>ii.  The October 31, 2018 Incident</u>

On October 31, 2018, Plaintiff walked from the ICU to Unit 5 North, where Dominique Nutt ("Nutt"), a nurse, was working an overnight shift.  (Defs.' 56.1 ¶¶ 193–95; Pl.'s 56.1 ¶¶ 193–95.)  At the time, Nutt was wearing a unicorn costume for Halloween, which included a head piece that had a unicorn horn and a rainbow tail.  (Defs.' 56.1 ¶¶ 196–97; Pl.'s 56.1 ¶¶ 196–97.)  Defendants claim that Plaintiff came up behind Nutt while she was standing at the nurses' station and grabbed the horn on her headpiece.  (Defs.' 56.1 ¶ 198.)  Defendants claim that Nutt then turned around, saw Plaintiff, and asked him what he was doing there, to which Plaintiff responded by saying that he knew Nutt would be wearing a costume and he wanted to see it.  (Defs.' 56.1 ¶¶ 198–201.)  Plaintiff confirms that he visited Nutt on that evening and the two had a conversation, but disputes that he grabbed her costume.  (Pl.'s 56.1 ¶¶ 198–201; *see also* Aff. of Shardul Koppar in Opp'n to Mot. for Summ. J. ("Pl. Aff.") ¶ 63 (Dkt. No. 54).)  After Plaintiff left Unit 5 North, he sent Nutt a text message, which read "I've always been a fan of this costume" and included a picture of a man dressed in an electrical plug costume and a woman dressed in an electrical socket costume.  (Defs.' 56.1 ¶¶ 202, 204; Pl.'s 56.1 ¶¶ 202, 204; *see also* Saccomano Aff. Ex. 21 (Dkt. No. 50-24).)  Nutt testified that she found the image to be offensive and responded with a text message that read "inappropriate much" and included an emoji; Nutt testified that she used the emoji to express that she was uncomfortable.  (Defs.' 56.1 ¶¶ 205–07; *see also* Saccomano Aff. Ex. 20 ("Nutt Dep."), at 25:19–26:6 (Dkt. No. 50-23).)  Plaintiff responded with a text message that read "It's hilarious," and included a picture of a woman dressed in a Curious George costume with her legs wrapped around the waist of a man dressed as The Man in the Yellow Hat.  (Defs.' 56.1 ¶¶ 208–09; Pl.'s 56.1 ¶¶ 208–09; *see also* Saccomano Aff. Ex. 21.)  Nutt testified that she also felt this image was inappropriate.  (Defs.' 56.1 ¶ 210; *see also* Nutt Dep. 26:21–23.)  Plaintiff disputes that Nutt found these text messages to be

inappropriate, explaining that he and Nutt were friends who had socialized outside of work and had a history of friendly banter via text messages.  (Pl. Decl. ¶ 64.)

Nutt was at the nurses' station when she received these text messages and showed the conversation to two of her colleagues that were sitting near her.  (Defs.' 56.1 ¶¶ 203, 211.) Nutt's colleagues advised Nutt to tell her manager about the text messages; Nutt did so the following morning, on November 1, 2018.  (*Id.* ¶¶ 212–213.)   Nutt's manager also found the text messages inappropriate, and Nutt agreed to allow her manager to show the text messages to someone in human resources.  (*Id.* ¶¶ 214–216.)  Nutt's manager then sent a message to Pagani in which she told Pagani that she had done an evaluation with one of her nurses who told her that she was frightened and receiving inappropriate text messages from Plaintiff.  (*Id.* ¶¶ 217–18.)

Pagani initiated a separate investigation of Nutt's complaint, and on November 6, 2018, Pagani interviewed Nutt.  (Defs.' 56.1 ¶¶ 219–20; Pl.'s 56.1 ¶¶ 219–20.)  Pagani testified that she found Nutt to be "100 percent credible."  (Defs.' 56.1 ¶ 221; *see also* Pagani Dep. 111:15–19.)

### iii.  Plaintiff's Termination

On November 2, 2018, Plaintiff received a call from the GME program administrator, Jennifer Vosganian-Clancy ("Vosganian-Clancy"), in which Vosganian-Clancy informed him that he would not be permitted on ORMC's premises while human resources completed its investigations.  (Defs.' 56.1 ¶ 222; Pl.'s 56.1 ¶ 222.)  Plaintiff had another call on November 7, 2018 with Vosganian-Clancy, Pagani, and Joanne Sturans ("Sturans"), the head of human resources.  (Defs.'s 56.1 ¶ 223; Pl.'s 56.1 ¶ 223.)  Sturans told Plaintiff that he had been taken off the rotation schedule and asked him (1) if he threatened to physically harm a physician, (2) if he was sending sexually explicit pictures to nursing staff, and (3) if he was approaching women to date him.  (Defs.' 56.1 ¶¶ 224–27; Pl.'s 56.1 ¶¶ 224–27.)  Plaintiff responded "no" to all three

questions, and Sturans instructed Plaintiff to write a statement documenting these denials. (Defs.' 56.1 ¶¶ 225–28; Pl.'s 56.1 ¶¶ 225–28.)  Plaintiff drafted this statement and emailed it to Vosganian-Clancy on November 8, 2018.  (Defs.' 56.1 ¶ 229; Pl.'s 56.1 ¶ 229.)

Sturans prepared a memorandum summarizing human resources' investigation for the CCC, and on November 8, 2018, human resources had a meeting with the IMR Program administration to review the results of the investigation.  (Defs.' 56.1 ¶¶ 230–31; Pl.'s 56.1 ¶¶ 230–31.)  The CCC convened an emergency meeting immediately following this meeting, which Mir, Punsalan, Obligado, El Zarif, Cordero, and Diaz attended along with IMR Program Assistant Veronika Jachimek.  (Defs.' 56.1 ¶¶ 234–35; Pl.'s 56.1 ¶¶ 234–35.)  The CCC discussed the information provided by human resources regarding the complaints that had been made against Plaintiff, and "voted and agreed unanimously" to "terminate [Plaintiff] effective immediately for cause," finding that "[d]ue to the hospital work environment, fear of the multidisciplinary staff and attending physician threatened, and repeated failures by [Plaintiff] to maintain continued long term improvement it is not in the best interest or safety for any parties involved, [ORMC][,] or [the IMR Program] to continue [Plaintiff's] employment or residency." (Saccomano Aff. Ex. 24, at 2 (Dkt. No. 50-27); *see also* Defs.' 56.1 ¶¶ 236–37; Pl.'s 56.1 ¶¶ 236–37.)  The CCC found that Plaintiff had committed "severe violation[s]" of §§ VI.A.3., VI.A.5., and VI.A.8. of his PGY-2 contract and was in violation of several ORMC policies. (Saccomano Aff. Ex. 24, at 3.)

The CCC's recommendation was submitted to the Resident Performance Committee ("RPC") for review and final approval.  (Defs.' 56.1 ¶ 240; Pl.'s 56.1 ¶ 240.)  The RPC is composed of members who are not part of the IMR Program.  (Defs.' 56.1 ¶ 241; Pl.'s 56.1 ¶ 241.)  The RPC met on November 14, 2018 and accepted the CCC's recommendation; Plaintiff

was terminated effective November 15, 2018.  (Defs.' 56.1 ¶¶ 242–43; Pl.'s 56.1 ¶¶ 242–43.)

Plaintiff received a letter advising him that his PGY-2 contract was terminated "for cause,

effective immediately, pursuant to Article VII(A) of the [PGY-2 contract], specifically but

without limitation for the reasons described in [§§] VII(A)(2), (3)[,] and (5)."  (Defs.' 56.1 ¶ 244;

Pl.'s 56.1 ¶ 244.)  The letter also advised Plaintiff that he could appeal his termination in

accordance with ORMC's GME Due Process Policy and Procedure, which was enclosed with the

letter.  (Defs.' 56.1 ¶ 245; Pl.'s 56.1 ¶ 245.)

### 3.  Plaintiff's Appeal of His Termination

Plaintiff appealed the termination of his PGY-2 contract and retained legal counsel who

helped him draft a letter in support of his appeal.  (Defs.' 56.1 ¶¶ 252–54; Pl.'s 56.1 ¶¶ 252–54.)

On May 3, 2019, ORMC sent Plaintiff a letter advising him that an ad hoc subcommittee had

been formed to hear his appeal, and that the hearing would be held on May 13, 2019.  (Defs.'

56.1 ¶¶ 255–56; Pl.'s 56.1 ¶¶ 255–56.)  The letter also stated that Plaintiff did not have the right

to be represented by counsel at the hearing, but that he could designate another ORMC resident

or medical staff member to represent him.  (Defs.' 56.1 ¶ 257; Pl.'s 56.1 ¶ 257.)  The

subcommittee consisted of Dr. Ronald Israelski ("Israelski"), Dr. John Dermigny, and Dr. Ulrich

Vieux.  (Defs.' 56.1 ¶ 259; Pl.'s 56.1 ¶ 259.)

At the hearing, Mir gave a detailed presentation on behalf of ORMC in which he went

through the numerous issues that had been documented throughout Plaintiff's tenure at ORMC

and the steps ORMC had taken to attempt to remediate them; while Plaintiff was given an

opportunity to give a presentation, he chose not to.  (Defs.' 56.1 ¶¶ 261–63; Pl.'s 56.1 ¶¶ 261–

63; *see also* Saccomano Aff. Ex. 10; Saccomano Aff. Ex. 16 (Dkt. No. 50-19).)  The hearing also

included a question-and-answer period, during which Israelski asked Plaintiff if he wanted the

chance to hear from his accusers.  (Defs.' 56.1 ¶¶ 264–65; Pl.'s 56.1 ¶¶ 264–65.)  Plaintiff

responded "sure," and Nutt and Selby both testified.  (Defs.' 56.1 ¶¶ 266–68; Pl.'s 56.1 ¶¶ 266–

68.)  The subcommittee unanimously recommended to uphold Plaintiff's termination.  (Defs.'

56.1 ¶ 270; Pl.'s 56.1 ¶ 270.)

### 4.  EEOC Charge

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity

Commission ("EEOC") on August 28, 2019.  (Defs.' 56.1 ¶ 271; Pl.'s 56.1 ¶ 271.)  The EEOC

issued a Dismissal and Notice of Rights on September 25, 2019.  (Defs.' 56.1 ¶ 272; Pl.'s 56.1

¶ 272.)

### B.  Procedural History

Plaintiff filed his Complaint on December 11, 2019.  (Dkt. No. 6.)  On January 31, 2020,

Defendants filed an Answer to the Complaint.  (Dkt. No. 20.)  The Parties attempted to mediate

on June 18, 2020, but this effort was unsuccessful.  (*See* Dkt. No. 21; Dkt. (entry for March 2,

2020).)  On May 7, 2021, Defendants requested a pre-motion conference in anticipation of their

forthcoming motion for summary judgment.  (Dkt. No. 39.)  The Court held a pre-motion

conference on May 25, 2021, (*see* Dkt. (entry for May 25, 2021)), and after completion of

outstanding discovery, (*see* Dkt. No. 46), the Court entered a briefing schedule, (*see* Dkt.

No. 47).  On August 24, 2021, Defendants filed their Motion for Summary Judgment, supporting

papers, and Rule 56.1 Statement.  (*See* Not. of Mot.; Defs.' Mem. of Law in Supp. of Their Mot.

for Summ. J. ("Defs.' Mem.") (Dkt. No. 49); Saccomano Aff.; Defs.' 56.1.)  On September 24,

2021, Plaintiff filed his Opposition, supporting papers, and Rule 56.1 Statement.  (*See* Pl.'s

Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Mem.") (Dkt. No. 55); Pl. Aff.;

Marcus Decl.; Pl.'s 56.1.)[6]  On October 8, 2021, Defendants filed their Reply and supporting

papers.  (*See* Defs.' Reply Mem. of Law in Further Supp. of Their Mot. for Summ. J. ("Defs.'

Reply Mem.") (Dkt. No. 60); Suppl. Aff. of Joseph A. Saccomano, Jr., Esq. in Further Supp. of

Defs.' Mot. for Summ. J. (Dkt. No. 61).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED.

R. CIV. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same).  "In deciding whether to award summary judgment, the court must construe the

record evidence in the light most favorable to the non-moving party and draw all reasonable

inferences in its favor."  *Torcivia*, 17 F.4th at 354; *see also Horror Inc. v. Miller*, 15 F.4th 232,

240 (2d Cir. 2021) (same).  "It is the movant's burden to show that no genuine factual dispute

exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also*

*Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4

(S.D.N.Y. Feb. 20, 2020) (same).

 "However, when the burden of proof at trial would fall on the non[-]moving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the non[-]movant's claim," in which case "the non[-]moving party must

come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order

---

[6] The Court notes that Plaintiff appears to have made several filing errors, including re-filing Defendants' Memorandum of Law, (*see* Dkt. No. 53), and filing the Marcus Declaration twice: once without exhibits, (*see* Dkt. No. 57), and one with exhibits attached, (*see* Dkt. No. 59).  The Court assumes that these are clerical errors, and will disregard Dkt. Nos. 53 and 55.

to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading.").  Indeed, "[w]hile summary judgment must be granted with caution in employment discrimination actions, . . . a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 302 (S.D.N.Y. 2009) (quotation marks omitted); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006) ("[I]t is the law of this Circuit that summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact, and may be appropriate even in the fact-intensive context of discrimination cases."  (citation and quotation marks omitted)).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual

issues to be tried." *Brod v. Omya*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting FED. R. CIV. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity*, 51 F. Supp. 3d at 419 (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (quotation marks omitted)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"). However, "[a]lthough witness credibility is usually a question of fact for the jury, 'broad, conclusory attacks on the credibility of a witness will not, by themselves, present question of material fact' for trial." *Desia v. GE Life & Annuity Assurance Co.*, 350 F. App'x

542, 544 (2d Cir. 2009) (summary order) (citation and alteration omitted) (quoting *Island Software & Comput. Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005)); *see also Ezuma v. City Univ. of N.Y.*, 665 F. Supp. 2d 116, 128 (E.D.N.Y. 2009) ("If the moving party has made a properly supported motion for summary judgment, the plaintiff may not respond simply with general attacks upon the defendant's credibility." (alterations omitted) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998))), *aff'd*, 367 F. App'x 178 (2d Cir. 2010).  As such, "when opposing a motion for summary judgment, the non-moving party may not respond simply with general attacks upon the declarant's credibility, but rather must identify affirmative evidence from which a jury could find that the non-moving party has carried its burden of proof."  *Moritz v. Town of Warwick*, No. 15-CV-5424, 2017 WL 4785462, at *8 (S.D.N.Y. Oct. 19, 2017) (citation and alterations omitted); *see also Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 181 (E.D.N.Y. 2015) ("'Although credibility assessments are improper on a motion for summary judgment,' a court may be justified in dismissing a claim when the 'plaintiff's version of the events is in such discord with the record evidence as to be wholly fanciful.'" (quoting *Pulliam v. Lilly*, No. 07-CV-1243, 2010 WL 935383, at *5 (E.D.N.Y. Mar. 11, 2010))).

## B.  Analysis

Plaintiff brings nine causes of action against Defendants, alleging that (1) Defendants discriminated against him based on his religion and national origin in violation of Title VII and the NYSHRL; (2) ORMC and GHVHS breached §§ VII.A., VII.C., and V.A. of Plaintiff's PGY-2 contract and the duty of good faith and fair dealing; and (3) Gilani, El Zarif, and Mir (hereinafter, the "Individual Defendants") tortiously interfered with Plaintiff's PGY-2 contract. (*See generally* Compl.)  Defendants seek summary judgment on all of Plaintiff's claims.  (*See generally* Defs.' Mem.)

<u>1.  Federal and State Discrimination Claims</u>

Title VII prohibits discrimination against an employee based on that employee's "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  The NYSHRL echoes this prohibition and adds to it, prohibiting discrimination against an employee based on that employee's "age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence."  N.Y. EXEC. LAW § 296(1).  Claims of discrimination under both Title VII and the NYSHRL are analyzed pursuant to the familiar three-part framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74–75 (2d Cir. 2016); *see also Farmer v. Shake Shack Enters.*, 473 F. Supp. 3d 309, 323–24 (S.D.N.Y. 2020) ("Claims under both Title VII and the NYSHRL . . . are generally treated as 'analytically identical,' and addressed together." (quoting *Lenzi v. Systemax*, 944 F.3d 97, 107 n.7 (2d Cir. 2019))).  "Under this framework, at the summary judgment stage, a plaintiff must first demonstrate a prima facie case of employment discrimination by showing that: '(1) [he] was within the protected class; (2) [he] was qualified for the position; (3) [he] was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.'"  *Farmer*, 473 F. Supp. 3d at 324 (quoting *Menaker v. Hofstra Univ*, 935 F.3d 20, 30 (2d Cir. 2019)); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 13 (2d Cir. 2008) (same).  "The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal."  *Walsh*, 828 F.3d at 75 (quoting *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998)).  "The burden of production then shifts to the defendant to offer a legitimate, non-discriminatory reason for the allegedly discriminatory conduct," and "[u]pon such a showing, the plaintiff must demonstrate that the reasons offered by the defendant are a mere pretext for discrimination."  *Farmer*, 473

28

F. Supp. 3d at 324 (citing *Littlejohn v. City of New York*, 795 F.3d 297, 307–08 (2d Cir. 2015));

*see also Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014) ("[T]he final and

ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for

unlawful discrimination.").

Defendants argue that Plaintiff cannot establish a prima facie case of discrimination

because there is no genuine dispute of material fact that Plaintiff did not suffer an adverse

employment action under circumstances giving rise to an inference of discrimination.  (Defs.'

Mem. 9.)  Defendants further argue that even if Plaintiff could establish a prima facie case of

discrimination, ORMC had legitimate, non-discriminatory reasons for promoting Plaintiff to

PGY-1 in 2017 rather than PGY-2 and for terminating Plaintiff's PGY-2 contract in 2018, which

Plaintiff cannot demonstrate were pretextual.  (*Id.*)  Finally, Defendants argue that in any event,

Plaintiff's claim based on Plaintiff's promotion to PGY-1 in 2017 rather than PGY-2 is time-

barred and the Individual Defendants must be granted summary judgment because (1) they

cannot face individual liability under Title VII as a matter of law and (2) there is no evidence that

the Individual Defendants aided or abetted discrimination as required to establish individual

liability under the NYSHRL.  (*Id.* at 9, 14–15.)

The Court addresses each argument to the extent necessary.

### a.  Prima Facie Case of Discrimination

Defendants appear to concede—or at least do not contest for purposes of the Motion—

that Plaintiff (1) is a member of a protected class, (2) was qualified to be an ORMC resident, and

(3) was subject to an adverse employment action in the form of the termination of his residency

and employment.[7]  (*See* Defs.' Mem. 9–12; Def's Reply Mem. 2–6.)  However, Defendants

argue that Plaintiff fails to establish a prima facie case of discrimination because "he cannot

present any evidence suggesting that ORMC's actions were in any way motivated by his religion

or national origin."  (Defs.' Mem. 9.)  The Court agrees.

"Under Title VII and the NYSHRL, a plaintiff need not prove . . . that 'the causal link

between injury and wrong is so close that the injury would not have occurred but for the act.'"

*Farmer*, 473 F. Supp. 3d at 325–26 (quoting *Lenzi*, 944 F.3d at 107).  "So-called but-for

causation is not the test.  It suffices instead to show that the motive to discriminate was one of

the employer's motives, even if the employer also had other, lawful motives that were causative

in the employer's decision."  *Lenzi*, 944 F.3d at 107 (quoting *Univ. of Tex. Sw. Med. Ctr. v.

Nassar*, 570 U.S. 338, 343 (2013)).  "The necessary inference may be derived from a variety of

circumstances, including 'the employer's criticism of the plaintiff's performance in ethnically

---

[7] The particular adverse employment action(s) for which Plaintiff seeks relief are unclear from Plaintiff's Complaint and the Parties' briefing on the Motion.  In the Complaint, Plaintiff identifies "the systematic harassment of [Plaintiff] by the [Individual Defendants], two instances of unjustified non-promotion, and the ultimate wrongful termination of his [PGY-2] residency contract."  (Compl. ¶ 1.)  However, Defendants focused on Plaintiff's promotion to PGY-1 instead of PGY-2 in June 2017 and Plaintiff's termination in their brief, (*see* Defs.' Mem.), and Plaintiff's only response was to clarify that "[t]he evidence regarding the failure to promote [Plaintiff] and his placement on probation is submitted simply as evidence of a pattern and practice of the targeting of [Plaintiff] and the attempt to drive him out which when it failed, resulted in the termination process," (Pl.'s Mem. 13).  As such, the Court concludes that the only adverse employment action for which Plaintiff seeks relief is his November 2018 termination.  *See, e.g.*, *Robinson v. Am. Int'l Grp., Inc.*, No. 08-CV-1724, 2009 WL 3154312, at *4 & n.65 (S.D.N.Y. Sept. 30, 2009) (collecting cases holding that where a party fails to address arguments in opposition papers on a summary judgment motion, the claim is deemed abandoned).  The Court thus need not decide whether a claim based on Plaintiff's promotion to PGY-1 in 2017 rather than PGY-2 would be time-barred.
   Separately, the Court cautions Plaintiff that "[c]ourts have held that an individual cannot maintain a private, non-class, pattern-or-practice claim."  *United States v. City of New York*, 631 F. Supp. 2d 419, 427 (S.D.N.Y. 2009) (collecting cases).  The Court will assume that Plaintiff's use of the phrase "pattern and practice," (Pl.'s Mem. 13), was only meant to be descriptive rather than to advance this theory of disparate treatment.

degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Detouche v. JTR Transp. Corp.*, No. 17-CV-7719, 2020 WL 7364116, at *10 (S.D.N.Y. Dec. 14, 2020) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009), *superseded by statute on other grounds*).

However, "[a] [p]laintiff's subjective belief that he was discriminated against is insufficient to raise an inference of discrimination." *Kalola v. Int'l Bus. Machines Corp.*, No. 13-CV-7339, 2017 WL 3394115, at *10 (S.D.N.Y. Feb. 28, 2017) (collecting cases), *report and recommendation adopted*, 2017 WL 381896 (S.D.N.Y. Aug. 4, 2017), *appeal dismissed*, 2018 WL 894064 (2d Cir. Jan. 24, 2018); *see also id.* ("[The] [p]laintiff's unsubstantiated, conclusory, and generalized assertion that thousands of Caucasian employees were promoted, and that Caucasian employees were treated more favorably than [the] [p]laintiff, is insufficient to carry his burden."); *accord Assue v. UPS, Inc.*, No. 16-CV-7629, 2018 WL 3849843, at *12 (S.D.N.Y. Aug. 13, 2018) ("[A] plaintiff's mere subjective belief that he was discriminated against because of his race does not sustain a race discrimination claim." (citation omitted)); *Lue v. JPMorgan Chase & Co.*, No. 16-CV-3207, 2018 WL 1583295, at *7 (S.D.N.Y. Mar. 2, 2018) ("[The] [p]laintiff cannot prove discrimination by speculation and reliance on her own subjective beliefs."), *aff'd*, 768 F. App'x 7 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 388 (2019). "Additionally, 'hostility or unfairness in the workplace that is not the result of discrimination against a protected characteristic is simply not actionable.'" *Assue*, 2018 WL 3849843, at *12 (alteration omitted) (quoting *Sethi v. Narod*, 12 F. Supp. 3d 505, 536 (E.D.N.Y. 2014)); *see also Sharpe v. MCI Commc'ns Servs., Inc.*, 684 F. Supp. 2d 394, 400–01 (S.D.N.Y. 2010) ("[The plaintiff's] subjective belief, unsupported by any concrete facts or particulars, that [his

supervisor] was 'nasty' and 'mean' when it came to people of color is insufficient to defeat summary judgment.  The fact that [the supervisor] did not yell at four white employees who might or might not have worked for him proves nothing.").

Finally, "[w]hile discriminatory remarks may constitute evidence of discrimination, in some circumstances they may amount to no more than stray remarks that are not sufficient to support a jury verdict in the plaintiff's favor."  *Eyuboglu v. Gravity Media, LLC*, 804 F. App'x 55, 57 (2d Cir. 2020) (summary order) (citing *Tommasi v. Isignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007)); *see also Lenzi*, 944 F.3d at 112 ("[S]tray remarks, 'without more, cannot get a discrimination suit to a jury.'" (emphasis omitted) (quoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998))).  In considering whether "isolated 'stray remarks' are probative of discriminatory intent," district courts are instructed to consider four factors: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror would view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)."  *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149–50 (2d Cir. 2010) (collecting cases), *cert. denied*, 562 U.S. 1279 (2011).

Plaintiff's principal piece of evidence in support of his claim is the fact that Gilani expressed surprise upon learning that Plaintiff is Indian.  Plaintiff asserts that Gilani's question regarding his and his family's heritage was "inappropriate[]" and that "[a] jury can reasonably infer that an inappropriate inquiry as to one's ethnicity followed by a reaction of surprise is akin to a direct and derogatory visual demonstrative statement by a supervisor about one's race and religion," especially given "the timing of Dr. Gilani's threat to [Plaintiff] that 'you will suffer.'"

(Pl.'s Mem. 7–8.)[8]  Plaintiff then argues that Gilani asserted his "biased influence" on El Zarif, who sent an email raising concerns about Plaintiff's performance and later filled out an unfavorable performance review, both of which were "fabricated or exaggerated," as evidenced by other, allegedly more positive evaluations of Plaintiff's performance.  (*Id.* at 8–9.)  These more positive evaluations include minutes of a meeting between Plaintiff and Castro-Nunez to discuss Plaintiff's performance issues and Krishna's evaluation of Plaintiff's March 2018 ICU rotation.  (*Id.*)  Finally, Plaintiff argues that Gilani influenced El Zarif, Mir, the other members of the CCC, and the members of the ad hoc committee who reviewed his appeal, which resulted in his termination, citing the cat's paw theory of liability.  (*Id.* at 9–10.)

The Court finds that Plaintiff has failed to meet his burden of establishing that his termination took place under circumstances giving rise to an inference of discrimination.  First, the Court does not agree that Gilani's expression of surprise at Plaintiff's national origin is probative of discriminatory intent.  While the fact that the remark was made by a supervisor could counsel in favor of a finding of discriminatory intent, the remark was neither made in relation to Plaintiff's termination nor in any way related to the process which led to Plaintiff's termination, *see Henry*, 616 F.3d at 149–50; indeed, the remark was made over two years before Plaintiff's termination and reasonably viewed in the context of Plaintiff and Gilani getting to

---

[8] Worth noting is the fact that Plaintiff equates his own religion and national origin.  It is undisputed that Gilani asked Plaintiff "where he was from and where his family was from," to which Plaintiff responded, "my family and I are originally from India."  (Defs.' 56.1 ¶¶ 47–48; Pl.'s 56.1 ¶¶ 47–48.)  There is no evidence that Gilani ever asked Plaintiff about his religion, and while India is a Hindu-majority country, it is home to many other religious groups, including a significant Muslim population.  *See India Has 78.9% Hindus, 14.2% Muslims, Says 2011 Census Data on Religion*, Firstpost (Aug. 26, 2015), https://www.firstpost.com/india/india-has-79-8-percent-hindus-14-2-percent-muslims-2011-census-data-on-religion-2407708.html.  As such, it is unreasonable to conclude that Gilani became aware of Plaintiff's religion as a result of this interaction.

know one another.  Plaintiff himself testified that "when we work with one another in a hospital

setting, we try [to get to] know one another as far as our backgrounds and maybe even

ask[] . . . questions."  (Pl. Dep. 134:13–17.)  Moreover, the Court does not find that a reasonable

juror would view the remark as discriminatory in substance.  It is undisputed that the sum total of

Gilani's remark consisted of the following: "you are Indian?"  (Defs.' 56.1 ¶ 49; Pl.'s 56.1 ¶ 49.)

It strains credulity to consider this statement to be indicative of discrimination.  *Cf. Sethi*, 12

F. Supp. 3d at 538 (finding statement, "'You f—king Indian, what do you think about yourself? I

will make sure you are sent back to India . . . ' [to] evince[] animus based on [the] [p]laintiff's

Indian origin, and [that] a reasonable jury could find the statement discriminatory"); *O'Diah v.

Yogo Oasis*, 954 F. Supp. 2d 261, 272 (S.D.N.Y. 2013) (finding statement made at the time the

plaintiff was fired that "'You Nigerians can't be trusted'—clearly support[s] the inference that

[the plaintiff's supervisor's] decision to terminate [the plaintiff] was motivated by discriminatory

animus").[9]  Even assuming arguendo that "'a reasonable juror could find that the remark itself

was discriminatory,' one remark is not enough to defeat summary judgment when it is 'too

remote in time and context to support a reasonable inference that [Plaintiff's] discharge was a

result of race discrimination.'"  *Brenner v. City of N.Y. Dep't of Educ.*, 132 F. Supp. 3d 407, 422

(E.D.N.Y. 2015) (quoting *Buckman v. Calyon Sec. (USA) Inc.*, 817 F. Supp. 2d 322, 336

(S.D.N.Y. 2011)).[10]

---

[9] While Plaintiff argues that "prior to this conversation and learning of [Plaintiff's] Indian ancestry . . . Gilani had been far more informal and friendly toward [Plaintiff]," (Pl.'s 56.1 ¶ 51), as noted above, courts are clear that "a plaintiff's mere subjective belief that he was discriminated against because of his [national origin] does not sustain a [national origin] discrimination claim."  *Assue*, 2018 WL 3849843, at *12 (quoting *Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013)).

[10] For similar reasons, the Court does not find Gilani's comment "while here, you will suffer" to be probative of discriminatory intent.  The content of the comment, while perhaps

Second, the Court disagrees with Plaintiff's interpretation of the record.  Plaintiff claims that he has "provided evidence that the performance issues allegedly observed"—and memorialized in El Zarif's September 6, 2016 email to Castro-Nunez—"were fabricated or exaggerated," and cites to the minutes of a meeting between Plaintiff and Castro-Nunez to discuss these performance issues.  (Pl.'s Mem. 8.)  El Zarif's September 6, 2016 email states that Plaintiff: (1) "has been arriving late for rounds almost on [a] daily basis despite multiple warnings"; (2) "is not preforming [sic] the tasks assigned to him (writing notes on his patients, seeing consults, talking to other physicians or family members, etc.[])"; (3) "seems absent minded during rounds and lectures"; (4) "often disappears in the middle of the day without informing anyone"; and (5) "is not a team player and does not have a good rapport with other residents."  (Saccomano Aff. Ex. 9.)  The meeting minutes state: "[Castro-Nunez] addressed concerns from El[]Zarif about [Plaintiff]. [1] 3x Running Late[;] [2] Not writing notes on patients[;] [3] Issues with dress code-Holes in his shirt.  [Castro-Nunez] also addressed a previous situation that happened when he was rotating in Internal Medicine (Block 2).  The Attending complained that [Plaintiff] requested to go home early without any explanation." (Marcus Decl. Ex. AA (Dkt. No. 50-12).)  The Court fails to see how a reasonable juror could view these two pieces of evidence as inconsistent such that El Zarif's concerns could be deemed "fabricated or exaggerated."  Further, the meeting minutes alone indicate that Plaintiff had

---

aggressive, does not in any way concern Plaintiff's religion or national origin, and "hostility or unfairness in the workplace that is not the result of discrimination against a protected characteristic is simply not actionable." *Assue*, 2018 WL 3849843, at *12 (alteration and citation omitted).  Moreover, it is undisputed that Plaintiff was researching something on his cell phone when he heard Gilani make this comment, and that the conversation which preceded this comment concerned reading books on pulmonology.  *See supra* I.A.2.a.  As such, it is equally possible that this comment was in reference to ORMC's residency program, particularly since it is common knowledge that medical residency programs are strenuous.

serious performance issues, undermining any suggestion that El Zarif's email was the result of Gilani's allegedly biased influence.

Plaintiff goes on to argue that El Zarif's late April 2018 evaluation of Plaintiff's March 2018 ICU rotation was biased because Krishna's evaluation of Plaintiff's performance during the same rotation was more positive.  (Pl.'s Mem. 9.)  Plaintiff also notes that Krishna is an "Indian physician."  (*Id.*)  While Krishna's evaluation of Plaintiff's performance is more positive, *see supra* I.A.2.b., the Court disagrees that this evidence demonstrates El Zarif's alleged bias.  By March 2018, Plaintiff's multitude of performance issues had already been well-documented by numerous care providers and would result in Plaintiff's placement on probation and the extension of his PGY-1 year before El Zarif's evaluation was submitted.  *See supra* I.A.2. Moreover, while Krishna's evaluation is more positive than El Zarif's, Krishna's evaluation is, at best, neutral, (*see* Marcus Decl. Ex. T), and a reasonable juror could conclude that Krishna is simply a more lenient evaluator than El Zarif.[11, 12]

Third, the Court finds that Plaintiff's attempt to make use of the cat's paw theory of liability stretches the doctrine too far.  "In a 'cat's paw' case, a plaintiff typically seeks to hold

---

[11] Moreover, evidence submitted to the Court by Plaintiff himself suggests that Krishna, in fact, shared Gilani and El Zarif's views of Plaintiff's performance.  For example, on April 26, 2017, El Zarif forwarded an email that he had received from the TRI Program coordinator alerting him that Plaintiff would be rotating through the ICU in May 2017 to Krishna and Gilani with the note "Guess who is coming back lol."  (Marcus Decl. Ex. BB (Dkt. No. 59-28).) Krishna responded with a smiley face emoji, and Gilani responded with:  "Aha.  I rather [sic] go to Catskills than Work with him."  (*Id.*)  As such, it appears that El Zarif, Krishna, and Gilani shared a view that Plaintiff's performance was substandard and that working with Plaintiff was undesirable.

[12] Also worth noting is the fact that Plaintiff's only theory in support of El Zarif's alleged bias against him is based on Gilani's statement concerning Plaintiff's national origin, which the Court has already rejected.  It is undisputed that El Zarif never asked Plaintiff about his national origin or religion and never made any comments about Plaintiff's national origin or religion. (Defs.' 56.1 ¶ 74; Pl.'s 56.1 ¶ 74.)

his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Rajaravivarma v. Bd. of Trs. for Conn. State Univ. Sys.*, 862 F. Supp. 2d 127, 149 (D. Conn. 2012); *see also Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016) ("[T]he 'cat's paw' metaphor . . . refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action."). However, to recover on a cat's paw theory of liability, a plaintiff must "adduce evidence of [an] act by his supervisors that was motivated by discriminatory animus, with the specific intent to cause his termination, and was the proximate cause of his termination." *Wright v. City of Syracuse*, 611 F. App'x 8, 11 n.2 (2d Cir. 2015) (summary order) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)). And "[t]he Supreme Court [has] explained that 'proximate cause requires . . . some direct relation between the injury asserted and the injurious conduct alleged, and excludes . . . those links that are too remote, purely contingent, or indirect.'" *Rajaravivarma*, 862 F. Supp. 2d at 149 (alterations omitted) (quoting *Staub*, 562 U.S. at 419).

Even construing the facts in the light most favorable to Plaintiff as the non-movant, Plaintiff's theory of cat's paw liability requires too many leaps in logic. In order for Plaintiff's theory of liability to succeed, Plaintiff would have to prove (1) that Gilani harbored animus against Plaintiff (which, for the reasons explained above, the Court finds that Plaintiff has not proven based on the undisputed facts); (2) that Gilani's alleged bias influenced El Zarif to become biased against Plaintiff; (3) that El Zarif convinced the entire CCC, including Mir and five other individuals to unanimously terminate Plaintiff because of Plaintiff's religion and national origin; (4) that either Gilani, El Zarif, or Mir, or some combination of them then

convinced the RPC—which is composed of members who are not part of the IMR Program—to accept Plaintiff's termination; and (5) that either Gilani, El Zarif, or Mir, or some combination of them convinced the ad hoc committee, consisting of three more individuals, to uphold Plaintiff's termination.  Put simply, Plaintiff has not adduced any evidence to support this protracted theory of liability, and no reasonable juror would credit it.  *See, e.g.*, *Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*, No. 18-CV-1702, 2021 WL 4033071, at *12 (D.D.C. Sept. 3, 2021) (rejecting cat's paw theory of liability and granting summary judgment for employer where "[t]he string of poor reports from unbiased evaluators following [the allegedly biased supervisor's] departure and [the decisionmaker's] independent assessment of [the] [p]laintiff's performance makes any connection between [the allegedly biased supervisor's] animus and the [non-promotion] decision too attenuated to constitute proximate cause"); *see also Cope v. Wal-Mart Stores E., LP*, No. 15-CV-1523, 2017 WL 2802722, at *11 (D. Conn. June 28, 2017) (finding that the plaintiff had failed to demonstrate a prima facie case of discrimination via a cat's paw theory of liability where the record "does not at all reveal [the allegedly discriminatory supervisor's] role in [the] [p]laintiff's actual termination," but "[i]nstead" revealed that "[t]he [p]laintiff's termination was based on several [performance improvement] coachings and the alleged violation of [the employer's] policies, all as determined by [four other decisionmakers] without any discernible participation by [the allegedly discriminatory supervisor]"); *cf. Braunstein v. Sahara Plaza, LLC*, No. 16-CV-8879, 2021 WL 2650369, at *14 (S.D.N.Y. June 28, 2021) (finding that the plaintiff had failed to establish pretext based on stray remarks made by supervisor via a cat's paw theory of liability where "nothing in the record suggests that [the allegedly discriminatory supervisor] was involved in the . . . ultimate termination of [the] [p]laintiff's employment, nor is there any

evidence that [the supervisor] manipulated [the ultimate decisionmakers] or any of the coworkers who made complaints about [the] [p]laintiff").

Finally, the Court agrees with Defendants that Plaintiff's heavy focus on the Individual Defendants' religions and national origins is inappropriate, at best.  While the Individual Defendants' religions and national origins are relevant, because "[c]ourts draw an inference against discrimination where the person taking the adverse action is in the same protected class as the [a]ffected employee," *Baguer v. Spanish Broadcasting Sys., Inc.*, No. 04-CV-8393, 2010 WL 2813632, at *11 (S.D.N.Y. July 12, 2010) (collecting cases), Plaintiff's theory of causation rests in large part on the notion that because the Individual Defendants are Muslim (or, in El Zarif's case, born nominally Muslim) and from Muslim-majority countries, every negative action they took toward Plaintiff could only be explained by historic animosity between Muslim and Hindu South Asian people.  (*See, e.g.*, Pl.'s Mem. 10 ("In the present case, Dr. Gilani, an individual who was from a Pakistani military family, attended a Pakistani military college, and held the rank of Captain in the Pakistani army while serving in the Kashmir . . . after learning [Plaintiff's] ethnicity resolved to 'make him suffer.'").)  But Plaintiff cannot "rely on the fallacy that because he belongs to a protected class, it is reasonable to conclude that anything negative that happened to him at work was because of his membership in that class." *Assue*, 2018 WL 3849843, at *15.  More pointedly, the Court refuses to draw the conclusion that the Individual Defendants' expressions of concern regarding Plaintiff's well-documented performance issues (many of which were identified by care providers other than the Individual Defendants, *see supra* I.A.2.) betrayed their prejudices against Plaintiff simply because of their heritages.[13]

---

[13] Additionally, the Court found many of the questions asked by Plaintiff's counsel during the Individual Defendants' depositions on this topic to be wholly improper and

### b.  Legitimate, Non-Discriminatory Reason

Even assuming arguendo that Plaintiff had demonstrated a prima facie case of discrimination, the Court finds that the Defendants have put forth several legitimate, non-discriminatory reasons for ORMC's termination of Plaintiff's residency and employment: namely, (1) Plaintiff's threat of physical violence against Gilani, and (2) Plaintiff's sexual harassment of Nutt.  (*See* Defs.' Mem. 13.)  Plaintiff does not appear to dispute the fact that these incidents would be legitimate, non-discriminatory reasons to terminate Plaintiff's residency and employment, but argues that there is a genuine issue of material fact as to whether these incidents took place.  (*See* Pl.'s Mem. 11–12.)  Plaintiff attests that he did not threaten Gilani and argues that "a reasonable trier of fact could find there is nothing offensive or overtly sexual about the text message sufficient to merit the draconian sanction imposed on [Plaintiff]," and "even if the text message conversation was deemed to have some inappropriate content, [Plaintiff] has alleged facts from which a reasonable trier of fact could find the exchange was not unwelcome and in fact even invited by . . . Nutt's flirtatious behavior."  (*Id.* at 12.)  Plaintiff also lodges objections regarding the reliability of ORMC's investigation and hearing processes.  (*Id.* at 12– 13.)  As such, Plaintiff argues that ORMC's stated reasons for terminating Plaintiff's residency and employment were pretextual.

The Court agrees with Defendants that Plaintiff cannot carry his burden to demonstrate pretext.  "It is not the Court's role to second-guess an employer's nondiscriminatory business decisions, question the manner in which it conducts its internal investigations, make an

---

disrespectful.  (*See, e.g.*, Saccomano Decl. Ex. 6 ("Gilani Dep."), at 145:21–146:11 (Dkt. Nos. 50-8–50-9) ("Q. Do you have any family members living or deceased who migrated from India to Pakistan?  A. No.  Q. . . . Do you know anybody who's been the victim of a war crime? A. No.  Q. Do you know anyone who's been the victim of a terrorist attack?  A.  Victim of a terrorist attack, like in [the] U.S.?  Q. In Pakistan.  A. I don't know people personally.  Q. Okay. Do you know anybody personally who's been the victim of a human rights violation?  A. No.").)

independent decision as to whether [Plaintiff] committed the subject misconduct, or determine whether the employer's actions were justified.  Even if it were shown that [P]laintiff did not in fact commit the misconduct for which he was fired, that alone does not suggest that the reason for his discharge was pretextual." *Maturine v. Am. Int'l Grp., Inc.*, No. 04-CV-9064, 2006 WL 3206098, at *6 (S.D.N.Y. Nov. 6, 2006) (citations omitted) (collecting cases); *see also Bentley v. AutoZoners, LLC*, 935 F.3d 76, 89 (2d Cir. 2019) ("[The plaintiff] cannot urge pretext simply by questioning whether her misconduct was sufficiently severe to warrant termination.  'The court's role is to prevent unlawful hiring practices, not to act as a superpersonnel department that second guesses employers' business judgments.'" (citation omitted) (quoting *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002))).  Plaintiff has offered no evidence to demonstrate that "the manner in which the investigation was conducted and the resulting decision to terminate him was discriminatorily motivated," which is fatal to his claim.  *Maturine*, 2006 WL 3206098, at *7.[14]

### c.  The Individual Defendants

While the Individual Defendants are entitled to summary judgment on Plaintiff's claims for the reasons explained above, the Individual Defendants are also entitled to summary judgment for the separate and independent reason that the Individual Defendants cannot be subject to individual liability under either Title VII or the NYSHRL.

As Defendants point out—and Plaintiff does not appear to contest, (*see* Pl.'s Mem. 13–15)—it is well settled that "individuals are not subject to liability under Title VII." *Sassaman v.*

---

[14] While not dispositive, the Court notes that Plaintiff's refutation of Defendants' claims that he threatened Gilani and sexually harassed Nutt consists exclusively of attacking Selby and Nutt's credibility and his own self-serving statements.  (Pl.'s 56.1 ¶¶ 175–78; Pl. Decl. ¶ 64.) But "when opposing a motion for summary judgment, the non-moving party may not respond simply with general attacks upon the [deponent's] credibility, but rather must identify affirmative evidence from which a jury could find that the non-moving party has carried its burden of proof." *Moritz*, 2017 WL 4785462, at *8 (alterations omitted) (quoting *Metito (Overseas) Ltd. v. Gen. Elec. Co*., No. 05-CV-9478, 2009 WL 399221, at *7 (S.D.N.Y. Feb. 18, 2009)).

*Gamache*, 566 F.3d 307, 315–16 (2d Cir. 2009) (quoting *Patterson v. County of Oneida*, 375

F.3d 206, 221 (2d Cir. 2004)); *see also Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012)

("Employers, not individuals, are liable under Title VII.").  Moreover, while "[t]he NYSHRL

allows for individual liability under two theories: where the individual defendant is considered

an 'employer,' of the plaintiff, or where the individual defendant aided and abetted the unlawful

discriminatory acts of others," Plaintiff cannot meet either standard.  *Santana v. Mt. Vernon City*

*Sch. Dist./Bd. of Educ.*, No. 20-CV-3212, 2021 WL 4523770, at *15 (S.D.N.Y. Sept. 30, 2021)

(citing N.Y. EXEC. LAW §§ 296(1), (6)).  "An 'employer' under [§] 296(1) 'has an ownership

interest in the relevant organization or the power to do more than carry out personnel decisions

made by others.'"  *Id.* (quoting *Townsend v. Benjamin Enters.*, 679 F.3d 41, 57 (2d Cir. 2012)).

Plaintiff has suggested in a conclusory fashion that "[t]riable issues of fact exist as to whether

[the Individual Defendants'] actions indicated that they had the power to do more than carry out

personnel decisions made by others," because "[t]hey had the power [to] supervise his work

[and] they had the power to reprimand and/or recommend [Plaintiff's] retention in the program,"

(Pl.'s Mem. 14), but Plaintiff offers no support for the notion that "power to supervise," "power

to reprimand," or "power to recommend retention" is the relevant standard.  Moreover, Plaintiff

appears to acknowledge that while the Individual Defendants had the "power to

influence . . . relevant hiring and firing decisions," they did not have the power to "actually

make" them.[15]  (*Id.*)  There is no genuine dispute that the Individual Defendants were not

"employers" under the NYSHRL.  And because the Court has already concluded that "there is no

underlying NYSHRL . . . violation, there was no aiding or abetting of acts forbidden by the

---

[15] Indeed, this conclusion is bolstered by Plaintiff's attempt to make use of a cat's paw
theory of liability.  If the Individual Defendants were themselves the decisionmakers, then the
use of a cat's paw theory of liability would have been unnecessary.

NYSHRL." *Boonmalert v. City of New York*, 721 F. App'x 29, 34 (2d Cir. 2018) (summary order) (citing *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004)); *see also United States v. N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d 365, 402 (S.D.N.Y. 2018) ("[A]n individual cannot aid and abet their own discriminatory conduct." (quotation marks omitted)).

### 2.  Contractual Claims

Plaintiff argues that ORMC and GHVHS breached his PGY-2 contract by: (1) terminating Plaintiff without cause, in violation of § VII.A.; (2) failing to provide Plaintiff with a "fair and equitable" grievance procedure, as provided under § VII.C.; and (3) failing to provide Plaintiff with a "suitable environment for Program training," as provided under § V.A. (*See* Compl. ¶¶ 101–25.)  Plaintiff additionally argues that ORMC and GHVHS violated the implied duty of good faith and fair dealing by engaging in the conduct which Plaintiff argues breached his PGY-2 contract "including but not limited to its wrongful termination of [Plaintiff]."  (*Id.* ¶¶ 126–30.)  Finally, Plaintiff argues that "the Individual Defendants . . . intentionally interfere[d] with [Plaintiff's] employment [by] entering into a malicious campaign to get [Plaintiff's] [PGY-2] contract terminated by dishonest, unfair[,] and improper means" by "submitting false and fraudulent academic evaluations, making false accusations of physical threats of violence, generally behaving in a demeaning and abusive manner toward [Plaintiff], failing to take appropriate action upon being make [sic] aware of such demeaning and abusive behavior, and failing to follow employer disciplinary and due process guidelines."  (*Id.* ¶¶ 169–77.)

Defendant argues, "[t]o begin with," that "Plaintiff's breach of contract claims against GHVHS must be dismissed because GHVHS is not a party to the PGY-2 [c]ontract."  (Defs.' Mem. 16.)  Plaintiff does not respond to this argument, (*see generally* Pl.'s Mem.), and as such, the Court holds that Plaintiff has conceded this point and enters judgment in favor of GHVHS on

43

Plaintiff's breach of contract claims. *See Scott v. JPMorgan Chase & Co.*, No. 13-CV-646, 2014 WL 338753, at *2 (S.D.N.Y. Jan. 30, 2014) ("[The] [p]laintiff's opposing [m]emorandum of [l]aw does not respond to this argument, and effectively concedes these arguments by his failure to respond to them." (citation omitted)).  Defendants also argue that "Plaintiff's breach of contract causes of action"—presumably referring to Plaintiff's breach of contract claims and breach of the implied duty of good faith and fair dealing claim—"must be combined into a single claim or dismissed because they are duplicative," before arguing that each of Plaintiff's breach of contract claims must be dismissed because ORMC did not breach any provision of Plaintiff's PGY-2 contract.  (Defs.' Mem. 16–22.)  Finally, Defendants argue that "[t]here is no evidence to support Plaintiff's specious claim that [the Individual Defendants] engaged in a 'campaign' to have Plaintiff's contract terminated or otherwise prevented Plaintiff or ORMC from fulfilling the terms of the PGY-2 [c]ontract," and that, in any event, Plaintiff cannot recover future earnings on his breach of contract claims.  (Defs.' Mem. 23–25.)[16]

The Court addresses each argument to the extent necessary.

### a.  Breach of Contract

"To succeed on a claim for breach of contract under New York law, a plaintiff must demonstrate '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'"  *Roelcke v. Zip Aviation,*

---

[16] Defendants additionally argued in their opening brief that the Court should decline to exercise supplemental jurisdiction over Plaintiff's contractual claims, because they arise under state law.  (*See* Defs.' Mem. 16.)  In his Opposition, Plaintiff invoked the Court's diversity jurisdiction, (*see* Pl.'s Mem. 15), which Defendants did not contest in their Reply, (*see generally* Defs.' Reply Mem.).  "By failing to respond to that argument in [their] Reply Memorandum, [Defendants] concede[] the point for purposes of [the Motion]."  *Cornelius v. Macy's Retail Holdings, Inc.*, No. 18-CV-678, 2019 WL 11816537, at *2 (W.D.N.Y. Aug. 5, 2019) (collecting cases).

*LLC*, — F. Supp. 3d — , 2021 WL 5491395, at *8 (S.D.N.Y. Nov. 23, 2021) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*, 375 F.3d 168, 177 (2d Cir. 2004)).[17]  "Because the plaintiff must prove each of these elements, the absence of a genuine issue of material fact due to lack of support for any one of them will require an award of summary judgment in favor of the defendant."  *Marks v. N.Y. Univ.*, 61 F. Supp. 2d 81, 88–89 (S.D.N.Y. 1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).  "Where the contract language is wholly unambiguous, summary judgment is appropriate.  Where the language is ambiguous, however, the contract's meaning generally becomes an issue of fact, thereby precluding summary judgment.  The key question of whether the contract language is ambiguous is a question of law to be decided by the court. . . . Although interpretation of an ambiguous contract is generally a question of fact . . . , summary judgment nevertheless may be appropriate where the court is able to resolve the ambiguity through a legal, rather than factual, construction of the contract terms."  *Sarinsky's Garage Inc. v. Erie Ins. Co.*, 691 F. Supp. 2d 483, 485–86 (S.D.N.Y. 2010) (citation omitted).

Generally, the "fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent," and "unambiguous provisions of a[] . . . contract must be given their plain and ordinary meaning."  *Catlin Specialty Ins. Co. v. QA3 Fin. Corp.*, 36 F. Supp. 3d 336, 340–41 (S.D.N.Y. 2014) (quotation marks omitted), *aff'd*, 629 F. App'x 127 (2d Cir. 2015).  "The language of a contract, however, is not made ambiguous simply because the parties urge different interpretations.  Further, a court must avoid any interpretation that would be absurd, commercially unreasonable, or contrary to the reasonable expectations of the

---

[17] Plaintiff's PGY-2 contract is governed by New York law.  (*See* PGY-2 Contract § VIII.C.)

parties." *Homeward Residential, Inc. v. Sand Canyon Corp.*, No. 13-CV-2107, 2014 WL 2510809, at *9 (S.D.N.Y. May 28, 2014) (quotation marks omitted).

### i.  Section VII.A.

The Court finds that ORMC did not breach § VII.A. of Plaintiff's PGY-2 contract. Section VII.A provides that Plaintiff could only be terminated for cause, including "[s]ubstantial breach of the terms of the [PGY-2 contract] by [Plaintiff]," one of which is that "[Plaintiff] shall comply with all policies applicable to Hospital exempt employees, including . . . compliance with [ORMC's] Sexual Harassment Policy." (PGY-2 Contract §§ VI.G., VII.A.2.)  ORMC terminated Plaintiff's employment and residency based on, inter alia, Plaintiff's violation of this term of his PGY-2 contract in threatening Gilani with physical violence and sexually harassing Nutt. (*See* Defs.' 56.1 ¶ 244; Pl.'s 56.1 ¶ 244.)  Plaintiff argues that there are material issues of fact as to whether Plaintiff threatened Gilani or "whether the supposedly sexually suggestive text message sent to . . . Nutt was sufficient cause to terminate [Plaintiff's] [PGY]-2 contract" because "[a] reasonable trier of fact could find that this text conversation was not sexual at all in content or if it was that it was far too mild to constitute a material breach of any hospital policy sufficient to justify [Plaintiff's] termination." (Pl.'s Mem. 16–17.)

The Court disagrees; Plaintiff indisputably violated the terms of ORMC's Sexual Harassment Policy in sending the above-referenced text messages to Nutt, which alone constituted sufficient cause to terminate Plaintiff's residency and employment under the unambiguous terms of his PGY-2 contract.  ORMC's Sexual Harassment specifically states that "[i]t is [ORMC's] policy to prohibit sexual harassment of our employees *in any form*," and as such, "[s]exually harassing conduct in the workplace, whether physical or verbal, committed by supervisors or non-supervisory personnel or any third party, is against the law and Hospital policy, and will not be tolerated." (ORMC Employee Manual 10 (emphasis added).)  The policy

goes on to explain that "no supervisor, employee, or any third party shall engage in any conduct, such as unwelcome sexual comments, jokes or innuendo, flirtations, advances or propositions, or physical or verbal sexual abuse, which creates a hostile work environment." (*Id.*)  The Court declines to accept Plaintiff's specious claim—born out of feigned naiveté—that the text messages Plaintiff sent to Nutt were not sexual in nature, and finds that the text messages were indisputably unwelcome, because Nutt testified under oath that she found the text messages offensive and inappropriate and that they made her uncomfortable.  (*See* Nutt Dep. 25:19–26:23; Saccomano Aff. Ex. 21.)  Contrary to Plaintiff's assertion, it is, in fact, entirely obvious to the Court that Plaintiff's text messages are exactly what ORMC's policy prohibiting "unwelcome sexual comments, jokes or innuendo, flirtations, advances or propositions" was designed to capture.  (Pl.'s Mem. 17.)  The Court thus finds that ORMC did not violate § VII.A. of Plaintiff's PGY-2 contract in terminating Plaintiff because Plaintiff's sexual harassment of Nutt violated ORMC's Sexual Harassment Policy and § VI.G. of Plaintiff's PGY-2 contract.

As such, the Court need not decide whether Plaintiff was validly terminated for the additional reason that he threatened Gilani with physical violence, though the Court notes that Plaintiff's entire argument on this point appears to be that Selby's account of the facts is at odds with LeCorps' "explicit[] deni[al]" that Plaintiff threatened Gilani, which is not a faithful recitation of the record evidence.  (Pl.'s Mem. 16; *see also* Marcus Decl. Ex. X, at 3 ("I *do not recall* [Plaintiff] speaking in a threatening manner or wishing violence/harm on any staff members of the hospital." (emphasis added)).)

### ii.  Section VII.C.

The Court also finds that ORMC did not breach § VII.C. of Plaintiff's PGY-2 contract. Section VII.C. provides that "[t]he Hospital will establish a grievance procedure whereby the [Plaintiff] may resolve, in a fair and equitable manner, a dispute or disagreement with the

Program Director, Associate Director[,] or Hospital concerning the interpretation, application[,] or enforcement of this [PGY-2 contract], or the Hospital's established policies, rules, regulations, directories[,] or bylaws." (PGY-2 Contract § VII.C.) Defendants argue that this section "*only* requires ORMC to establish a grievance procedure, which it undisputedly did," (Defs.' Mem. 19 (emphasis in original)), to which Plaintiff's response is to argue that "Defendants would now have this Court rule that having established the policy as required by the contract, they were not contractually bound to follow it," (Pl.'s Mem. 18). As such, Plaintiff appears to concede that Defendants did, in fact, establish a grievance procedure as required under § VII.C. of Plaintiff's PGY-2 contract. The crux of Plaintiff's objection then appears to be that the grievance procedure that was established was not "fair and equitable" because it did not provide Plaintiff with a host of procedural rights that Plaintiff asserts Defendants were obligated to provide for the grievance procedure to be "fair and equitable." (*Id.* at 18–19.)

Many of the procedural rights to which Plaintiff argues he was entitled mirror those afforded to criminal defendants under the United States Constitution, such as the Sixth Amendment rights to confrontation, to the effective assistance of counsel, and to be informed of the nature and cause of the accusation, and the due process right to be provided with exculpatory evidence, as established in *Brady v. Maryland*, 373 U.S. 83 (1983). (*See, e.g.*, Pl.'s Mem. 19 (listing, inter alia, "[Plaintiff] was denied full access to the scope of allegations against him," "[Plaintiff] was denied access to the exhibits that were to be offered against him," "[Plaintiff] was denied effective use of council [sic] to prepare and defend himself at the hearing," "the hospital did call . . . witnesses [to testify] without giving [Plaintiff] proper notice," "[Plaintiff] was not given the opportunity to question those witnesses," and "[ORMC] suppressed the existence of exculpatory witness statements").) However, Plaintiff is not a criminal defendant,

and thus, is not entitled to the constitutional protections provided to criminal defendants.  *See,
e.g.*, *Yu v. City of New York*, No. 05-CV-1118, 2005 WL 8159559, at *2 (E.D.N.Y. Aug. 10,
2005) ("The Sixth Amendment governs only criminal prosecutions." (quotation marks omitted)).
Moreover, because ORMC is indisputably not a state actor as a privately owned non-profit
corporation, ORMC was not obligated to afford Plaintiff any due process rights whatsoever.  *See,
e.g.*, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 930 (1982) ("[T]he Due Process Clause
protects individuals only from governmental and not from private action."); *cf. Williams v.
Josephs*, No. 91-CV-8178, 1992 WL 367056, at *1 (S.D.N.Y. Dec. 2, 1992) ("Due process rights
must be afforded prior to [the] discharge of public agency employees, but [the] plaintiff, a
temporary employee of a private corporation, was not entitled to such rights and suffered no due
process violation upon transfer." (citation omitted)).  Rather, the only "due process" rights to
which Plaintiff was entitled are those established by Plaintiff's PGY-2 contract, and Plaintiff
offers no support for the conclusion that the phrase "fair and equitable" is ambiguous or could
reasonably be interpreted to guarantee an array of rights which approximate those protected by
the constitution for criminal prosecutions.  *See also Homeward Residential*, 2014 WL 2510809,
at *9 ("[A] court must avoid any interpretation that would be absurd, commercially
unreasonable, or contrary to the reasonable expectations of the parties." (quotation marks
omitted)); *Romer v. Bd. of Trs. of Hobart & William Smith Colls.*, 842 F. Supp. 703, 707
(W.D.N.Y. 1994) ("[T]he 'mere existence of a policy manual or an internal grievance procedure
is insufficient' to create a contractual limitation on the employer's rights with respect to
termination of an employee." (quoting *Porras v. Montefiore Med. Ctr.*, 588 N.Y.S.2d 135, 138
(App. Div. 1992), *appeal denied*, 611 N.E.2d 300 (N.Y. 1993))).

Moreover, while the Court finds that this provision of Plaintiff's PGY-2 contract did not incorporate the Bill of Rights, ORMC's Due Process Policy still offers a host of procedural protections and rights to residents.  For instance, the policy provides that upon receiving a resident's appeal from a sanction such as termination, the DME must appoint an ad hoc subcommittee to hear the appeal that consists of at least two members of the GME committee who do not work in the resident's department, *see supra* I.A.1., reducing the possibility that subcommittee members approach the appeal with any preconceived notions regarding its merit. After the hearing, the subcommittee can recommend upholding, reducing, or reversing the sanction, but the GME program committee as whole must vote to accept or reject its recommendation, and the Program Director whose decision the resident is appealing may not participate in this process—reducing further the possibility for bias.  *See id.*  And while the policy does not allow for the resident to be represented by counsel, it does allow for a resident to appoint another resident or member of the medical staff as their representative.  *See id.*  The Court finds that this process more than satisfies ORMC's obligations under § VII.C. of Plaintiff's PGY-2 contract.

### iii.  Section V.A.

Even assuming arguendo that Plaintiff can prove that ORMC breached § V.A. of his PGY-2 contract by failing to provide Plaintiff with "a suitable environment for Program training," (PGY-2 Contract § V.A.), Plaintiff cannot recover on a claim for breach of contract under this provision because he cannot prove that he was damaged by ORMC's alleged breach. As the Court explained above, there is no genuine dispute that Plaintiff was validly terminated for cause based on his sexual harassment of Nutt (at least), as such, Plaintiff cannot prove that, for instance, ORMC's alleged violation of the "Resident Evaluations" policy, (*see* Pl.'s Mem. 20), caused Plaintiff any damage for which he is entitled to recover.  To the extent that Plaintiff

seeks to challenge his termination or the procedure which led to his termination, (*see id.* (citing, inter alia, "[GME] Due Process Policy and Procedure")), "the Court holds that they are duplicative of [Plaintiff's other] breach-of-contract claim[s] and therefore may be dismissed as a matter of law." *Karsch v. Blink Health Ltd.*, No. 17-CV-3880, 2021 WL 2075716, at *2 (S.D.N.Y. May 24, 2021).

### b.  Breach of Duty of Good Faith and Fair Dealing

"Under New York law, parties to an express contract are bound by an implied duty of good faith." *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 399 (S.D.N.Y. 2019) (quoting *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002)); *see also Advanced Oxygen Therapy Inc. v. Orthoserve Inc.*, No. 21-CV-2089, 2021 WL 5359458, at *3 (S.D.N.Y. 2021) ("Under New York law, the duty of good faith and fair dealing 'is implied in every contract, to the effect that neither party shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" (quoting *CCR Int'l Inc. v. Elias Grp., LLC*, No. 15-CV-6563, 2021 WL 1253892, at *4 (S.D.N.Y. Apr. 5, 2021))).  "The implied covenant of good faith and fair dealing is breached when a party acts in a manner that would deprive the other party of the right to receive the benefits of their agreement." *1357 Tarrytown Rd. Auto, LLC v. Granite Props., LLC*, 37 N.Y.S.3d 341, 343 (App. Div. 2016); *see also Moran v. Erk*, 901 N.E.2d 187, 191 (N.Y. 2008) ("The implied covenant . . . embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." (quotation marks omitted)).  "In order to find a breach of the implied covenant, a party's action must directly violate an obligation that may be presumed to have been intended by the parties." *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (quotation marks omitted).

However, "[a] claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *Arcadia*, 356 F. Supp. 3d at 400 (quoting *Harris*, 310 F.3d at 80); *see also Advanced Oxygen*, 2021 WL 5359458, at *3 ("Under New York law, claims for breach of the implied covenant of good faith and fair dealing are duplicative of breach of contract claims 'when both arise from the same facts and seek the identical damages for each alleged breach.'" (quoting *Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015))); *Karsch*, 2021 WL 2075716, at *3 ("It is well established that a plaintiff bringing a breach-of-contract claim cannot also bring a claim for breach of the covenant of good faith and fair dealing.").

Here, it is clear that Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is based on the same facts as, and indeed is premised on, his breach-of-contract claims.  In expounding this cause of action in his Complaint, Plaintiff specifically refers to ORMC's "conduct as described above," i.e., in Plaintiff's discussion of his breach of contract claims.  (Compl. ¶ 128.)  And in opposing Defendants' Motion, Plaintiff argues that "[t]o grant summary judgment regarding Plaintiff[']s claims for breach of the duty of good faith and fair dealing the Court would have to accept as undisputed facts very much in dispute," and lists Plaintiff's threat of violence against Gilani, Plaintiff's sexual harassment of Nutt, and Plaintiff's alleged denial of due process via ORMC's grievance procedure—the very issues which underly Plaintiff's breach of contract claims.  (Pl.'s Mem. 21–22.)  As such, Plaintiff's claim for breach

of the implied covenant of good faith and fair dealing is dismissed as redundant of Plaintiff's

breach of contract claims.[18]

### c.  Tortious Interference

"Under New York law, to state a claim of tortious interference with a contract, a plaintiff

must allege '(1) the existence of a valid contract between the plaintiff and a third party; (2) the

defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-

party's breach of the contract without justification; (4) actual breach of the contract; and

(5) damages resulting therefrom.'" *Kamdem-Ouaffo v. Balchem Corp.*, No. 17-CV-2810, 2019

WL 10097484, at *8 (S.D.N.Y. June 27, 2019) (quoting *Kirsch v. Liberty Media Corp.*, 449 F.3d

388, 401 (2d Cir. 2006)).  As such, breach of contract by a third party is a necessary predicate to

a tortious interference claim.  Here, because the Court has already found that ORMC did not

breach Plaintiff's PGY-2 contract, Plaintiff cannot succeed on a claim for tortious interference

against the Individual Defendants.  *See New Paradigm Software Corp. v. New Era of Networks,*

*Inc.*, No. 99-CV-12409, 2002 WL 31749396, at *10 (S.D.N.Y. Dec. 9, 2002) ("[S]ince there was

no breach of contract, [the defendant] did not tortiously interfere with the [contract]." (collecting

cases)).

---

[18] Having granted judgment for ORMC on all of Plaintiff's breach of contract claims, the
Court declines to rule on whether Plaintiff can recover future earnings on those claims.

III.  Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted.  The

Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 48), and enter

judgment for Defendants Orange Regional Medical Center, Greater Hudson Valley Health

System, Inc., a/k/a Garnet Health, Dr. Aamir Gilani, Dr. Samer El Zarif, and Dr. Sajid Mir.

SO ORDERED.

Dated:    February 3, 2022
          White Plains, New York

_____
        KENNETH M. KARAS
     United States District Judge